**UNITED STATES of America**

v.

**Donaldo FIGUEROA–CRUZ.**

**Criminal Case No. CR 11–S–424–S.**

United States District Court,
N.D. Alabama,
Southern Division.

Dec. 11, 2012.

Joyce White Vance, U.S. Attorney, Gregory R. Dimler, William Russell Chambers, Jr., U.S. Attorney's Office, U.S. Probation, United States Probation Office, U.S.M., United States Marshal, Birmingham, AL, for United States of America.

William M. Dawson, Dawson & Wallace Law Office, Birmingham, AL, Ebony C. Ameen, Ameen & Assoc. PC, Atlanta, GA, for Donaldo Figueroa–Cruz.

### ORDER

C. LYNWOOD SMITH, JR., District Judge.

This case is before the court on defendant Donaldo Figueroa–Cruz's "Motion to Suppress" (doc. 28), "Amended Motion to Suppress" (doc. 30), and "Further Motion to Suppress" (doc. 37). After holding an evidentiary hearing, the magistrate judge entered his findings and recommendation on August 2, 2012 (doc. 47). Defendant filed a "Notice of Appeal From Magistrate to District Judge" on August 7, 2012 (doc. 49).

Upon consideration of the entire record in this case, the court hereby ADOPTS the findings of the magistrate judge as the findings of this court, and ACCEPTS his recommendation. Accordingly, the motions to suppress (docs. 28, 30, and 37) filed by defendant Donaldo Figueroa–Cruz are DENIED.

### FINDINGS AND RECOMMENDATION

PAUL W. GREENE, United States Chief Magistrate Judge.

On July 6, 2012 Donaldo Figueroa–Cruz filed an amended Motion to Suppress evidence seized during seized by law enforcement officers from a home in Birmingham, Alabama on October 5, 2011. (Doc. # 30). On July 17th he filed a second amendment. (Doc. 37) The motions are related to evidence seized by the government during an investigation into drug trafficking in the Northern District of Alabama. The investigation began in August and resulted in the arrest of the defendant and others in early October. The Government has submitted a response to each motion. (Docs. # 29 & 40) In the amended motion Mr. Figueroa anticipated the legal arguments later made in the government's response. (Doc. # 30 see unnumbered pages 2–6) A hearing on the motion began on Thursday July 19th and was reconvened and concluded on Monday July 23rd. The issues are joined and the matter is ripe for disposition. The motions are before the undersigned Magistrate Judge upon the June 25th reference of United States District Judge C. Lynwood Smith in accord with 28 U.S.C. 636(b)(1)(B); L.R. 72.1(b)(1)(B); see also *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *United States v. Powell,* 628 F.3d 1254, 1256 (11th Cir.2010)

### THE MOTIONS

Mr. Figueroa's amended motions implicate two separate Fourth Amendment principles governing the seizure of evidence for use in a criminal prosecution. The first, is the newly announced rule that the act of attaching a GPS tracking device

to a vehicle and the use of that device to record the activities of the owner or exclusive driver is a search for the purposes of the Fourth Amendment and that to attach such a device without the authority of a warrant is a search conducted after an unconstitutional trespass.[1] The second principle relevant to Mr. Figueroa is the long standing rule that a warrantless entry by law enforcement officers into a dwelling is *per se* unreasonable under the Fourth Amendment in the absence of clear evidence that the reasons for such an entry are so compelling that the conduct falls into one of the narrowly drawn judicially created exceptions to the warrant requirement.

Mr. Figueroa's first amended motion asserted, *inter alia* that he had "... driven[a] vehicle in the time prior to his arrest ..." to which the government had attached a GPS tracking device without authority of a warrant and further that "... [he had done so] as a bailee and with the permission of the **record owner** of the

vehicle." (Doc. # 30 p. 1)(emphasis added) The government's undisputed conduct and the defendant's assertion of a property interest in a vehicle animates a consideration of the rule announced on January 23, 2012 by the Supreme Court in *United States v. Jones*, — U.S. ——, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) While the holding of *Jones* can be simply stated the implication of the rule can not. The Court identified the analytical task in *Jones* to be to "... decide whether the attachment of a Global—Positioning—System (GPS) tracking device to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets, constitutes a search or seizure within the meaning of the Fourth Amendment." *Jones*, — U.S. at ——, 132 S.Ct. at 947 The Court ultimately held that "... the Government's installation of a GPS device on a **target's** vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" 132 S.Ct. at 949 (emphasis added)[2] The announced rule is

1. Mr. Figueroa's initial motion was of necessity "bare bones" because the Supreme Court had only announced the relevant rule in this term. The amendments to the first motion are clearly timely. Moreover, although the challenged conduct occurred prior to the pronouncement of the rule relied upon Figueroa, who has not yet been tried, may properly move to suppress evidence based on that rule because it applies retroactively to him: a defendant "may invoke ... [a] newly announced rule of substantive Fourth Amendment law" until his "conviction ... become[s] final on direct review." See *Davis v. United States*, — U.S. ——, 131 S.Ct. 2419, 2431, 180 L.Ed.2d 285 (2011).

2. As discussed below in light of the Fourth Amendment reasonableness standard it is relevant to consider the factual underpinnings in both *Jones* and those presented here. In *Jones* it was undisputed that beginning in 2004, Antoine Jones had been the target of an investigation by the FBI and the District of Columbia Metropolitan Police Force. For at least a year officers had conducted surveillance on a nightclub owned by Jones, em-

ployed a pen register and also a wiretap on his cell phone to gather evidence against him. In 2005 the government attached a GPS tracker to a Jeep of which the "Government acknowledged,[], Jones was the 'exclusive driver'" for the purposes of tracking *his* movement to gather evidence to further the investigation of his personal involvement in the distribution of drugs.(Emphasis added) see 132 S.Ct. at 949, N. 2 In the present case as more fully set forth below agents attached a GPS device to a vehicle they had probable cause to believe was being used to facilitate the transportation and distribution of narcotics by an organization operating in at least two states. At the time the GPS tracker was attached in September 2011 the agents in this case had no idea if who if anyone was the exclusive driver of the green Jetta. In one case the government attached a device with the intent to track the movements of a known subject already under investigation for more than a year. In the other case agents attached the device to track the movement of the vehicle itself with absolutely no knowledge that it would be driven at some later time by Donald Figueroa–Cruz.

derived from an opinion written by Justice Scalia joined by three justices and the concurring opinion of Justice Sotomayor.[3]

The second amended motion also asserted that Mr. Figueroa seeks to suppress evidence discovered by the government "... [o]nly after [an] illegal entry and arrest of the defendant ..." (Doc. # 37 p. 1) The defendant maintained that while agents had obtained a search warrant from a state court judge for the residence in which he was found law enforcement officers had previously and unlawfully entered the dwelling before the warrant was actually issued.

## OPERATIVE FACTS

Special Agent Sean Stephens of the Drug Enforcement Agency was the only witness called by either party. Stephens was the Case Agent and it was Stephens who made certain decisions which give rise to the issues addressed below. For the purposes of this order the facts set out below are presumed to be undisputed. To the extent that there may be an actual dispute of fact as opposed to a mere dispute over the significance of a fact or the effect that fact upon a legal conclusion, the factual findings below are based upon the undersigned's assessment of the credibility of the witness. The existence of the fact is not subject to *de novo* review if adequately supported by the record absent a new hearing before an Article III judge. *Powell*, 628 F.3d at 1256–57 The legal conclusions, however are entitled to no presumption and are subject to a review *de novo*. The facts are as follows.

(1) In August 2011 law enforcement officers in the Austin Texas area arrested two people in possession of in excess of 5 Kilograms of heroin. (Tr. 7/23/12 pp. 72–75)[4] Following the arrest at least one individual became a Cooperating Source or "CS". The CS told officers that he/she had made several trips from Texas to Birmingham, Alabama driving a "load car" or vehicle used to transport heroin in large quantities. (Tr. 7/19/12 pp. 12–13) The CS told authorities that on one occasion while making such trip in a gray Lexus automobile he/she had received a traffic citation. (Tr. 7/19/12 p. 14) Officials were able to confirm that a traffic ticket had been issued to the CS and that at the time he/she was driving a Lexus registered to a man named Jose Benitez of Austin, Texas.(Tr. 7/23/12 p. 81) The CS stated that when he/she arrived in Birmingham he/she would meet a "heavy set Hispanic male who drove a green Jetta with a broken out window covered with tape." (Tr. 7/19/12 p. 13) The CS would remain in an apartment located at 310 Beacon Crest Drive in Homewood, Alabama or motel while the Hispanic male exchanged the "load car" for the Jetta and drove it away. The man would return the "load car" in a few hours and the CS would drive it back to Texas. (Tr. 7/19/12 p. 14) While the "load car" was gone the CS told agents that he/she had the use of the green Jetta which remained at the apartment or motel. (Tr. 7/19/12 p. 14)

(2) Agents in Texas relayed the information received from the CS to agents in Birmingham including S.A. Stephens on August 23rd or 24th. (Tr. 7/19/12 p. 12) Using a map drawn by the CS Birmingham agents located the Apartment at 310 Beacon Crest Parkway. Agents could view the interior of the apartment through an open window. The unit appeared to

---

**3.** "I join in the Court's opinion because I agree that a search within the meaning of the Fourth Amendment occurs, at a minimum, '[w]here, as here, the Government obtains information by physically intruding on a constitutionally protected area'" 132 S.Ct. at 954

**4.** Agents involved in the case here expected to find heroin but discovered cocaine instead. That fact has no apparent relevance to any issue to be decided.

have been abandoned and after a "week or two" the agents concluded that the location was no longer in active use by the traffickers. (Tr. 7/19/12 p. 15) Local law enforcement patrol officers, however continued to look for the Jetta. Approximately two weeks after the information was received from Texas the Jetta was discovered in the parking lot of the Willows Apartment complex at 3565 Lorna Road in Hoover, Alabama. (Tr. 7/19/12 p. 16, 17) Officers obtained the vehicle's Alabama license plate number and determined that the Jetta was registered to Hosea Cueverra Ugartae at 310 Beacon Crest Lane Homewood, Alabama (Tr. 7/19/12 p. 16) Agents also found that no Alabama drivers license had been issued to a Hosea Cueverra Ugartae. (*Id.*)

(3) Agents conducted sporadic visual surveillance on the Jetta but were never able to observe anyone drive or even approached the car. (Tr. 7/19/12 p. 17) After a time agents "[d]ecided to put a GPS tracker on the vehicle in the hopes that whenever somebody did drive it off, [they] would be able to track the movements of the vehicle." (*Id.*) On September 20th, 2012 Detective Brock of the Hoover Police Department attached a self-powered GPS tracking device to the Jetta while it was in the parking lot of the Willows Apartment complex. (Tr. 7/19/12 p. 18) [5] At the time the device was attached agents did not have nor had they sought a warrant to either attach the device or to use it to monitor the movements of the Jetta. (*Id.*)

(4) At the time the GPS device was attached agents had information that (1) the Jetta was registered to Hosea Cueverra Ugartae at 310 Beacon Crest Drive in Homewood, Alabama (2) that it had been driven by a heavy set Hispanic male and (3) that the Jetta was available for use by the drivers of the "load cars" during the period of time the unidentified Hispanic male had possession of the vehicle which contained the drugs which had been transported from Texas. Agents had never seen anyone drive the Jetta after it was located at the Willow Apartment complex. They had no information to suggest that the Jetta had ever been driven by Donaldo Figueroa–Cruz although they knew from official sources that the vehicle was not registered to anyone by that name and was not registered to anyone known to be living at the Willow Apartment complex. (Tr. 7/19/12 p. 16)

 5. Agents continued physical surveillance on the Jetta after the GPS was attached and never saw Donaldo Figueroa–Cruz or anyone else in the car until September 25th. On that date Hoover Detective Brock was in the area of the Willow Apartments and received a signal from the GPS unit that the Jetta was in motion. (Tr. 7/19/12) Brock contacted a Hoover patrol unit and instructed the officers to stop the vehicle if they observed the driver commit a traffic violation. (Tr. 7/19/12 p. 20, p. 48–49) [6] The vehicle was

5. The court fords that the tracker was not placed on the vehicle before September 20th 2012. The testimony established September 20th to be the day agents began to receive signals from the device. Counsel for Mr. Figueroa suggested that at a preliminary hearing in a state court proceeding in a related case someone had testified that the device had been in place for "about a month". (Tr. 7/19/12 p. 45) Because the court finds that the only reasonable inference from the evidence is that the agents began to monitor the device the day it was attached the GPS was placed

on the Jetta on September 20th. The device was on the Jetta only seventeen days before the defendant's arrest.

6. Mr. Figueroa–Cruz contended through counsel that the officers merely wanted to stop the vehicle to further the drug investigation. Assuming there was probable cause to believe a traffic violation had occurred any additional motive on the part of the police is irrelevant. "[A] police officer may stop a vehicle '[w]hen there is . . . probable cause to believe that a driver is violating any one of a

subsequently stopped by the patrol car. The driver was identified as Miccareo Rotel Benitez from Austin, Texas. (Tr. 7/19/12 p. 20) Benitez' wife was the only passenger. (*Id.*) The Jetta was not searched and the occupants were released after the traffic stop.

6. On October 4th, nine days after the traffic stop and fifteen days after agents began to monitor the GPS device they received a signal indicating that the Jetta was located in the parking lot of Walmart store in on Lakeshore drive in Homewood. (Tr. 7/19/12 p. 21, p. 45) Agents knew from experience as well as from information received from the CS in Texas that the parking lots of large stores were locations favored by drug dealers in which to pick up or drop off a drug courier vehicle. (Tr. 7/19/12 p. 22) After observing that no one was in the Jetta Special Agent Stephens entered the Walmart store. In the store he saw a heavy set Hispanic male purchasing a large quantity of FoodSaver brand heat sealing bags. (*Id.*) At the time the agents did not know the man's name but he was identified the following day as Donaldo Figueroa–Cruz. Sealing bags such as those the defendant purchased in bulk were known to Stephens to be used by drug dealers to seal and package drugs as well as bulk currency for transport. (Tr. 7/19/12 p. 23) The defendant left the store and got into the green Jetta. This was the first time agents could link Figueroa to the

vehicle. After the defendant left the store agents followed him to an auto parts store, a Mexican restaurant and then to the Willow Apartments where the Jetta had been parked when the GPS unit has been attached. (Tr. 7/19/12 p. 24)

7. On the following morning October 5th at approximately 8:00 am Agent Stephens was monitoring the GPS tracker and saw that the Jetta was moving. Using information from the device he went to the location where the Jetta had become stationary which proved to be the parking lot of a Howard Johnson motel on Oxmoor Road near the interstate highway in Homewood. (Tr. 7/19/12 p. 25) When he arrived at the motel Special Agent Stephens saw not only the green Jetta but also a gray Lexus with Texas licence plates. Stephens contacted agents in Austin Texas and confirmed that the Lexus was the same car that had been driven by the CS when he/she received a traffic ticket while transporting heroin from Texas to Alabama. (Tr. 7/19/12 p. 26) At approximately 8:30 am the defendant, who was still unidentified came out of a motel room and drove away in the Jetta. He returned to the Willow Apartments where he was observed by Detective Brock entering the second floor common area which provided access to multiple units.[7] When the defendant left the apartment one hour later he was seen carrying a white shopping which contained multiple boxes which could not

---

multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.' " *United States v. Strickland,* 902 F.2d 937, 940 (11th Cir.1990) (quoting *Delaware v. Prouse,* 440 U.S. 648, 655–57, 99 S.Ct. 1391, 1397, 59 L.Ed.2d 660 (1979)). In *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) the Supreme Court held that the constitutional "reasonableness" of a traffic stop is to be determined irrespective of the "intent," either of the individual officer involved, or any theoretical "reasonable officer." The only questions is whether the suspect's behavior gave rise to

probable cause sufficient to justify the Fourth Amendment seizure. "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Whren,* 116 S.Ct. at 1775.

7. The officers were not able to see which apartment unit the defendant had entered because the common area provided access to more that one apartment and the doors could not be observed from the vantage point of the police.

be further identified. The defendant drove the Jetta back to the Howard Johnson. While the defendant had been at the Willow Apartments under surveillance by detective Brock, agents stationed at the Howard Johnson observed two Hispanic males come out of a room and clean trash out of the Lexus.(Tr. 7/19/12 p. 27) The defendant returned to the motel where he briefly spoke with the other Hispanic males. Still carrying the white shopping bag he got into the Gray Lexus and drove away. Agents followed the Lexus now driven by the defendant. Agents remaining at the Howard Johnson saw the two Hispanic males who had earlier cleaned out the Lexus get into the green Jetta previously driven by the defendant and drive away. Agents followed the Jetta and the occupants to a restaurant.(Tr. 7/19/12 p. 28)

8. Agents maintaining visual surveillance on the gray Lexus followed the vehicle to a house located at 1156 Skyline Drive in Birmingham, Alabama. (Tr. 7/19/12 p. 29) The Lexus was parked in the driveway of the house in front of a basement garage. (*Id.*) Agents were unable to keep a constant visual surveillance on the Lexus because the location, but were able to establish a close perimeter on all access streets to ensure that it could not leave the house without being observed. (*Id.*) Despite the limitations on surveillance an agent was able to position himself so that he could see one side and a portion of the rear of the house. (*Id.*) During a drive-by surveillance of the house agents saw that the Lexus was no longer in the driveway and concluded that because it could not have left the area with having been seen it must have been moved into the basement garage. (Tr. 7/19/12 pp. 28–29)

9. At 10:30 am a white Toyota SUV arrived at the house and parked in the rear. Approximately four minutes later the Toyota left. Agents on the scene asked Jefferson County Sheriff's Deputies to conduct a "traffic stop" of the Toyota.[8] (Tr. 7/19/12 p. 32) When deputies stopped the Toyota the driver was identified as James Harris who was known to investigators working with agent Stephens as a high level drug dealer in the Birmingham area. (Tr. 7/19/12 p. 32, pp. 36–37) Harris consented to a search of the vehicle. When nothing illegal or incriminating was found he was released. Harris drove to a parking lot where he got out of the Toyota and moments later was picked up by another person driving a Chevrolet Avalanche. Harris got into the driver's seat and drove the truck back to the house on Skyline Drive arriving at approximately 11:55 am. Harris again briefly parked at the rear of the house and left again a few minutes later. (Tr. 7/19/12 pp. 32–33)[9]

10. At 1:00 or 1:30 pm agents on the scene dispatched another agent to begin work on an affidavit in support of a search warrant for the house on Skyline

---

8. It is unclear what traffic offense, if any authorized the stop. For the purposes of the present motion it does not matter. No evidence was obtained as a result of a search conducted after purportedly obtaining the consent of the driver. More importantly, the defendant here had no reasonable expectation of privacy in the Toyota.

9. In a statement made later to authorities Mr. Figueroa stated that he has been packaging currency for the return trip to Texas when "... about and hour or so before he was arrested, Artavis McGowan arrived at the residence and dropped off several more bundles of money and put them on the counter." (Tr. 7/19/12 p. 43) A reasonable inference is that various distributors came to the house to confirm delivery and arrange for the payment for their share of the load. While expressly not made a finding here, it is possible that Harris made a dry run with his first trip to the Skyline Dr. House and returned with his share of the payment for the drugs when he returned in the Avalanche.

Drive. While the agent was preparing the affidavit other people were seen entering and leaving the house. At 1:15 Anthony McGowan left in a white Honda which had been parked in the front of the house. At 2:50 pm Princess Floyd left in a White Acura.[10] At 3:02 pm a black Jeep arrived at the residence. Eight minutes later the Jeep driven by Artavis McGowan with two male passengers left the residence. (Tr. 7/19/12 pp. 33–34) Nearby Jefferson County Sheriffs' deputies were asked by the drug agents to stop the Jeep if the deputies observed the driver commit a traffic infraction. Agents followed the Jeep and were able to observe from a distance the events transpiring after the Jeep had been stopped by the patrol unit for an alleged traffic violation. (*Id.*) At some point Artavis McGowan gave sheriff's deputies consent to search the Jeep. The deputies discovered a total of $4,400.00 in several bundles wrapped with rubber bands in the console and additional bundles of currency also wrapped with rubber bands in a black suitcase found in the rear of the vehicle. The deputies also saw an empty box which had contained a FoodSaver brand heat sealer device.(Tr. 7/19/12 p. 34) In addition to the money McGowan had on his person and in his car deputies discovered that the passengers also had large sums of currency. One had $5,500.00 in cash and the other an additional $3,400.00. (Tr. 7/19/12 p. 35) When asked to identify themselves one of the passengers gave police a false name. (Tr. 7/19/12 p. 34) After a check was made this passenger was ultimately placed under arrest. All three men refused to sign receipts for the money when given an opportunity to do so.

11. Beginning at 1:00 or 1:30 pm and continuing through the Traffic stop of the Black Jeep which began shortly after 3: 10 pm agent Stephens was in communication with the agent charged with the task of preparing the search warrant affidavit. Stephens was providing the agent with updates on the activity at the house including the fact that a number of people were coming and going.(Tr. 7/19/12 pp. 35–36) While drug agents could observe the traffic stop they were not actually involved. The Sheriff's deputies actually engaged in the traffic stop were in communication with those agents and information about the progress of the traffic encounter was passed on to Agent Stephens at the house. After about an hour Stephens was told that the deputies had completed all of the tasks related to the stop including the arrest of the passenger. Stephens was told that because the basis for the stop no longer existed the deputies were about to release McGowan and his remaining passenger. (Tr. 7/19/12 p. 36;pp. 54–56) Stephens believed that since the deputies had discovered and seized the money it was probable either McGowan or his passenger would use a cell phone to alert the occupants of the house as soon as they were released.(*Id.*) Because he was concerned that the occupants of the house would soon know of the presence of the agents outside Stephens made the decision to have agents enter the house to "secure the scene" while waiting for the warrant to authorize a search. It was Stephens' intention to "knock and announce" but also to force entry into the house if no one answered the door. (Tr. 7/19/12 p. 37) At 4:18 pm agents knocked on the door and entered the house without a warrant. (Tr. 7/19/12 p. 38) They went into the house on the first floor and saw a set of stairs leading to the basement. Stephens went downstairs

**10.** The lease agreement on the property had been signed by Anthony McGowan and Princess Floyd.

where he found Figueroa–Cruz standing near a sink in a kitchen area. On the counter next to the defendant Stephens observed what later proved to be six bricks of cocaine, as well as several stacks of currency and money counting machine. (Tr. 7/19/12 pp. 39–40) [11] According to Stephens a television in the room in which the defendant was found was tuned to a Hispanic channel playing at a particularly high volume which it difficult to hear. (Tr. 7/23/12 p. 80) Through a door in the basement agents entered into the adjoining garage and discovered the Lexus from which the rear bumper had been removed. (Tr. 7/19/12 p. 40) After he was advised of his rights Figueroa–Cruz told agents that he had removed the bumper in order to retrieve the cocaine from the Lexus and was in the process of packaging the money to place back into the compartment concealed behind the bumper for transport back to Texas.[12] (*Id.*) At some later time he told the authorities that he had been to the house on two or three other occasions to drop off similar quantities of cocaine. On each of the earlier occasions he had been to admitted the house by Anthony McGowan. (Tr. 7/19/12 p. 41–42) When asked if he had driven the Jetta to the Skyline drive address on the Night of September 30th Mr. Figueroa said that he had not but told the agents that the Jetta had been driven on that night by his "boss" from Austin, Texas.[13] Figueroa claimed to know his boss only by the nickname "Gotto" (Tr. 7/19/12 pp. 44–45)

---

**11.** Based on their information the agents had expected to find heroin rather than cocaine. While heroin was found in the house the Texas load appears to have been cocaine. The fact is of no legal relevance.

**12.** The voluntariness of the statement's attributed to the defendant and the government's compliance with the prophylactic requirements of *Miranda* are not considered here.

## ANALYSIS

### *Jones,* trespass and the Fourth Amendment

■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." Not all intrusions violate the Fourth Amendment—only "unreasonable" ones do. As the Supreme Court has specifically observed, " 'reasonableness is still the ultimate standard' under the Fourth Amendment." *Soldal v. Cook County,* 506 U.S. 56, 71, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (quoting *Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).

In recent decades when deciding a Fourth Amendment question courts have been charged with providing for a remedy, usually through the exclusionary rule "when government officers violate a person's 'reasonable expectation of privacy.' " *United States v. Jones,* —— U.S. ——, ——, 132 S.Ct. 945, 950, 181 L.Ed.2d 911 (2012). In addition to considering a "reasonable expectation of privacy", as it has recently been explained that there is apparently also "a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') [the Fourth Amendment] enumerates." *Id.* In rediscovering the trespassory origins of the Fourth Amendment the *Jones* majority observed that the more recently adopted "reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." *id.* at 952.

---

**13.** It appears undisputed that agents learned that the Jetta had traveled to Skyline Dr. On September 30th only after the fact from the GPS generated data. There is no evidence that agents learned to Jetta was in motion on the 30th and followed It there.

The majority stated that in cases beginning with *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) the Court itself had deviated from an exclusively property-based approach to the Fourth Amendment which had marked Fourth Amendment jurisprudence until the latter half of the 20th century. (*Jones,* 132 S.Ct. at 950) The majority opinion in *Jones* did not rely on the logic that use of a GPS tracker is a search because it violates a person's "reasonable expectation of privacy," which—as *Jones* acknowledged, *id.* at 949–50—had been the predominant approach to Fourth Amendment jurisprudence since the 1960s but upon an "exclusively property-based approach" and found that a search occurred when the government "physically occupied private property for the purpose of obtaining information," which "would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." 132 S.Ct. at 949–50 (citing *Entick v. Carrington,* 95 Eng. Rep. 807 (C.P.1765)). In such cases in which there is no trespass, there has been no search. In *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the Court found that the Fourth Amendment did not apply because "[t]he taps from house lines were made in the streets near the houses." *Id.* at 457, 48 S.Ct. 564. In a like manner the Court concluded that no search occurred in *Goldman v. United States,* 316 U.S. 129, 135, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), where a listening device was placed on the outer wall of defendant's office for the purpose of overhearing conversations held within the room.

■ This property-based trespass analysis alters the matrix most frequently applied in the assessment of Fourth Amendment issues because questions of ownership or the existence a legally cognizable property interest have not generally been considered of controlling analytical importance when determining whether an expectation of privacy in a place or thing is reasonable. Under the reasonable expectation of privacy test ownership, [and presumably a legal bailment] while perhaps factors to be considered, are not dispositive. *United States v. Chaves,* 169 F.3d 687, 690 (11th Cir. 1999); *United States v. Ramos,* 12 F.3d 1019, 1023 (11th Cir.1994). It has been generally accepted since *Katz* that "even where a defendant does not own the property searched, he or she may nonetheless have a reasonable expectation of privacy in that place by virtue of his or her relationship with that place." *Chaves,* 169 F.3d at 690. In *Jones* however, the attachment of the GPS device only becomes a search within the meaning of the Fourth Amendment precisely because of an actual property interest.

It is significant that the Court expressly relied upon the undisputed fact that Antoine Jones had been determined by the District and Circuit Courts to have been the "exclusive driver" of the vehicle upon which the government trespassed in attaching the GPS device when finding he had "standing" to assert a claim of trespass. Unlike an "expectation of privacy" the holding of *Jones* is implicated only when the defendant first establishes a legally cognizable property interest. If that were not the threshold requirement the Court would have held, as the four concurring justices would have held, that Jones had a constitutionally protected reasonable expectation of privacy in his movements and tracking those movement violated the Fourth Amendment protection. The Court did not decide that question. Indeed Justice Alito pointed to the very circumstance to be found in the present case when he wrote

In [*Jones* ], the Fourth Amendment applies, the Court concludes, because the officers installed the GPS device after respondent's wife, to whom the car was registered, turned it over to respon-

dent for his exclusive use. See ante, at 951. But if the GPS had been attached prior to that time, the Court's theory would lead to a different result. The Court proceeds on the assumption that respondent "had at least the property rights of a bailee," ante, at 949, n. 2, but a bailee may sue for a trespass to chattel only if the injury occurs during the term of the bailment. See 8A Am.Jur.2d, Bailment § 166, pp. 685–686 (2009). So if the GPS device had been installed before respondent's wife gave him the keys, respondent would have no claim for trespass—and, presumably, no Fourth Amendment claim either.

*Jones*, 132 S.Ct. at 961 [14]

■ Here unlike *Jones* the government does not concede Mr. Figueroa's claim of a cognizable property interest. It is also important to observe the Figueroa has produced no evidence of any kind to support his assertion of a bailment. While is not clear what quantum of proof is re-

quired to establish the contested fact of a bailment it would seem a fundamental notion that Figueroa bears the burden of producing it. The only evidence on the question is as follows. (1) Agents in Birmingham had information that a criminal organization ring based in Austin Texas transported large quantities of illegal drugs to Birmingham, Alabama using a number of "load cars" driven by couriers who did not own the vehicles. (2) Agents knew that a CS had driven one load to Birmingham in a gray Lexus known to be owned by someone else. (3) The drivers of the "load cars" would meet a heavy set Hispanic male who drove a green Jetta who would then drive the "load car" away leaving the green Jetta for the use of the "load car" driver. (4) The green Jetta was registered to Hosea Cueverra Ugartae at 310 Beacon Crest Lane in Homewood, Alabama an apartment agents knew to be empty before the green Jetta was located.[15] (5) On September 25th, 2011 the

**14.** Justice Alito detected a second related flaw in the approach of the majority which is of some relevance here. He noted that absent actual physical contact with the subject chattel there is no trespass at common law. He observed that the police might activate a stolen vehicle GPS system already installed without ever actually touching the property itself. While Justice Alito was obviously addressing situations under which such a GPS system had previously been installed and the owner of the vehicle was presumably aware of the presence of the device one aspect of his review is applicable here. If, as the majority opinion appears to hold, the trespass itself must occur at the time of ownership or a lawful possession with sufficient indicia of bailment before there is a search; what happens if the trespass takes place while one person is a lawful bailee and she later transfers possession to another and only after that transfer is the GPS system remotely activated by authorities without any actual touching of the property itself ? Has there been an unlawful governmental "trespass" on to an "effect" or property of the second operator? After all, the second "bailee" has no reasonable expec-

tation of privacy in his movements under the majority formulation of the rule. His Fourth Amendment rights are violated, if at all, only if the government actually "physically occupies private property" which did not happen.

**15.** Figueroa made clear in his cross examination that it appears there is no evidence to establish to whom the Jetta "belonged". Agent Stephens said that he did not know who owned to Jetta and was then asked.

Q. Okay. And you still haven't found out who it belonged to, Have you?

A. I know who it was registered to.

Q. That's as far as you know ... a name, isn't it ?(the ... separation is added to reflect the actual question)

A. Yes, sir.

Q. I mean, you haven't located Hosea Ugartae or whatever his name is, ave you?

A. No

(Tr. 7/19/12 p. 46) Rather then proof of a bailment the testimony casts significant doubt on the assertion Figueroa makes in his Motion that he was driving the Jetta " ... as a bailee with the permission of the *record owner* of the vehicle." (Doc. # 30 (emphasis added)) The only known "record owner" of the

green Jetta was being driven by Miccareo Rotel Benitez from Austin, Texas.[16] (6) On September 29th the green Jetta was driven to the Skyline Drive address by a man described by Mr. Figueroa as his "boss from Texas" but allegedly known to him as only "Gotto". (7) On October 4th agents saw the man later identified as Figueroa–Cruz get into the green Jetta in the parking lot of a Walmart store and drive away although they did not know if someone else had driven the car to the lot. (8) The green Jetta was driven by Figueroa to the Willow Apartment where it had been parked at the time the GPS tracker was attached on September 20th. (9) On the morning of October 5th the Jetta registered to Hosea Cueverra Ugartae was the Howard Johnson motel where agents saw Figueroa drive it back to the Willow Apartments. (10) Figueroa later left the motel parking lot in the Gray Lexus registered to Jose Benitez of Austin, Texas. (11)The two Hispanic males who had driven the Lexus from Texas to Birmingham took possession of the green Jetta and drove it to restaurant. (12) The green Jetta was in motion on other occasions but there is no evidence concerning the identity of driver. (Tr. 7/19/12 p. 47–48)

In *United States v. Luna–Santillanes*, 2012 WL 1019601 (E.D.Mich.2012) the district court citing *Jones*, supra rejected a

claim similar to that asserted by Figueroa because the defendant failed to produce "... evidence showing either an ownership or contractual interest in any of these vehicles or exclusivity of such use...." (*Id.* at **7) Mr. Figueroa has likewise offered no proof of exclusivity, indicia of ownership or even an unqualified permission to use the Jetta.[17] More directly on point is *United States v. Hanna*, 2012 WL 279435 (S.D.Fla.2012) in which the district Court concluded defendants who on occasion used a Ford Expedition with the owners permission to facilitate armed robberies did not have the property interest in that vehicle necessary to assert a *Jones* trespassory search claim. ("Neither defendant was the owner or exclusive user of the Expedition." *Hanna*, **3) Mr. Figueroa argues that *Hanna* is not applicable it "... involved a case where no constructive possession could be claimed." (Doc. 30 p. 3) In fact there is less evidence of exclusivity or ownership here than that in *Hanna*.[18] Mr. Figueroa argues that merely because he was not driving the Jetta on the one occasion when it was stopped by police "... does not invalidate his permissive use." Perhaps not, if there were **any** proof of exclusive use but there is not. The evidence is that the load car drivers used the Jetta, "Gotto" the boss from Texas used the Jetta, Benetiz used

Jetta is Ugartae described even by Figueroa's counsel as merely "a name".

**16.** Authorities had previously learned that the gray Lexus "load car" was registered to a Jose Benitez also of Austin, Texas.

**17.** In point of fact he does not appear to know who the owner might be.

**18.** What the significance of "constructive possession" may be is unclear. There is no doubt that on at least two occasions Figueroa was in actual, not constructive possession of the Jetta. There are also times where he was not in possession constructive or otherwise.

The touchstone in not "constructive possession" but exclusive possession or proof of bailment both of which are lacking here. Figueroa cites *United States v. Hernandez*, 433 F.3d 1328, 1333 (11th Cir.2005) *Hernandez* stands for the unremarkable proposition that someone exercising dominion and control over a vehicle containing contraband has constructive possession of the contraband. How that principle relates to the possessory interest of the driver in the vehicle itself is not readily apparent. In *Hanna* for example it was not in dispute that various defendants had driven the car at different time, only that they didn't own it and were not the exclusive operator.

the Jetta and it was registered to Ugartae. Like the Ford Expedition appeared to be the "Company Car" used by a group of thugs to facilitate armed robberies in *Hanna* the green Jetta was simply the "Company Car" of a large scale drug distribution enterprise. The CS had told agents that the load drivers used the Jetta when they were in Birmingham.

Moreover, there is absolutely no proof that Figueroa–Cruz was in possession of the Jetta at the time the device was attached. To be sure the GPS tracker was attached while the vehicle was in the parking lot of an apartment complex where Figueroa was later seen. At the time the device was attached on September 20th, however no one had been observed in or around the Jetta. Five days after that Benitez was driving the vehicle. Four days after Benetiz the Jetta was driven by "Gotto". Six day later it was driven by one of the men who drove the Lexus from Texas.[19] Mr. Figueroa–Cruz has failed to establish that he has the requisite property interest in the Jetta to assert a violation of his own constitutional rights.[20]

**The Evidence and reasons for suppression**

■■■ Mr. Figueroa contends that the "recording device ... was significant in bringing about the search and seizure of the contraband which is the basis for the charges ..." (Doc. # 30 p. 1) He therefore "moves for an order suppressing any and all contraband, currency and other matters found or located in the residence where this defendant was arrested." (*Id.* p. 6) Presumably Figueroa contends that if there had been an unconstitutional trespass when the GPS tracker was attached to the Jetta all evidence of any kind obtained after that point is due to be suppressed, though he does not explain why that would be so.[21] The initial burden of showing "a causal nexus between the Fourth Amendment violation and the evidence he seeks to suppress" falls on the defendant. *United States v. Teague*, 2010 WL 6529640 (N.D.Ga.2010) (citing and quoting *United States v. Holmes*, 505 F.3d 1288 (D.C.Cir.2007)) Although the exclusionary rule applies equally to "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence

**19.** The Texas CS had also said that the "load car" drivers would often wait at an apartment while to contraband was driven to another location. In this period the "load car" drivers used the vehicle. The evidence supports the conclusion that on the day the device was attached it was in the possession of such a person as much as it supports the conclusion that the Jetta was in the possession Figueroa.

**20.** *Jones* left open the question of whether a warrant is required for GPS *monitoring* or if, instead, warrantless GPS monitoring is lawful when officers have reasonable suspicion or probable cause to believe that a *vehicle* is involved in illegal activity. *United States v. Amaya*, 853 F.Supp.2d 818 (2012) (emphasis added)

**21.** It must be recalled that the evidence in *Jones* which was at issue was the GPS data used to prove circumstantially that Jones him-

self was at a particular location because his primary vehicle was at that location. In her parade of horribles Justice Sotomayor said it was this data which made the monitoring as opposed to the attachment an intrusion on a privacy interest beyond a mere trespass to property. She noted that "In cases involving even short-term monitoring, some unique attributes of GPS surveillance relevant to the *Katz* analysis will require particular attention. GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Jones*, 132 S.Ct. at 954 The *Jones* majority did not hold that GPS monitoring was unconstitutional only that a trespassory intrusion on the property of a citizen was. The evidence at issue in Jones was circumstantial proof of where Mr. Jones had been and only tangentially where his Jeep had been.

later discovered and found to be derivative of [the] illegality or 'fruit of the poisonous tree,' " the Supreme Court "has never held that evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Segura v. United States,* 468 U.S. 796, 804, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (internal quotation marks omitted). Rather, the relevant inquiry is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (internal quotation marks omitted).

■ Only two events involving Mr. Figueroa came to light from the attachment of the GPS to the Jetta on September 20th. First, because of the GPS signal the agents knew that the Jetta was in the parking lot of the Walmart store on October 4th. Because they were in the parking lot agents were able to enter the store and see a man matching a description given to them by the CS in Texas weeks before buying items they knew to be favored by drug traffickers to package drugs and currency. Only after he left the store were they able to connect the man they saw to the Jetta, a vehicle they also knew from other sources to be linked to the drug trade. Although they did not learn his name agents learned of the identity of Mr. Figueroa during this encounter. If this knowledge of the defendant's identity is considered evidence it is not subject to suppression as a matter of law. The Eleventh Circuit has squarely held that "the exclusionary rule does not apply to evidence to establish the defendant's identity in a criminal prosecution." *United States v. Farias–Gonzalez,* 556 F.3d 1181, 1189 (11th Cir.2009) see also *United States v.*

*Lopez–Garcia,* 565 F.3d 1306, 1320 (11th Cir.2009).

■ The second event occurred the following day of October 5th. Again because of the GPS signal agents learned that the Jetta, but not necessarily Mr. Figueroa was at the Howard Johnson motel. When they arrived at the motel they saw not only the Jetta but also the gray Lexus. Agents had independent and verified information that the Lexus was a "load car". Only after they saw the Jetta and the Lexus in the parking lot did they see Figueroa come out of room and drive away in the Jetta. From that point forward Figueroa and the Hispanic males at the motel were kept under visual surveillance by the agents. Figueroa was followed while driving the Lexus, not the Jetta to the Skyline Drive address. After the Lexus arrived at the Skyline Drive house agents observed known drug dealers coming and going.

■ The exclusionary rule generally requires the exclusion of evidence that is "directly" or "primarily" discovered as the result of an unlawful search. 6 Wayne R. LaFave, *Search and Seizure* § 11.4 (4th ed.2004). Stated another way, the exclusionary rule prohibits the "introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States,* 487 U.S. 533, 536, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) Despite the apparent breadth of the exclusionary rule, it is not without limitations. Indeed, suppression of evidence should not be a court's first impulse. *Hudson v. Michigan,* 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). "[E]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Hudson,* 547 U.S. at 592, 126 S.Ct. 2159. Under what has become

known as the "attenuation doctrine," "but-for cause, or causation in the logical sense alone, can be too attenuated to justify exclusion." *Id.* (quotation and citation omitted).

██ There is no bright-line rule for the application of the attenuation doctrine. Instead, courts are to look to three factors when evaluating whether evidence has been sufficiently purged of the taint from an unlawful search or seizure: " 'the temporal proximity of the unlawful [search] and the emergence of the incriminating evidence at issue, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.' " *Hudson,* 547 U.S. at 592, 126 S.Ct. 2159 (quoting *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)) (internal brackets omitted).

Here the search of the Skyline Drive house took place on the same day agents went to the Howard Johnson motel because the GPS monitor placed the Jetta at that location. The temporal proximity factor does not favor attenuation. The second factor—intervening circumstances—focuses on whether any circumstances or events "interrupt[ed] the causal connection between the illegal act and the possibly tainted consent." *United States v. Delancy,* 502 F.3d 1297, 1311 (11th Cir.2007). Here, assuming without deciding that learning of the location of the Jetta on October 5th by using the GPS tracker was itself a search the subsequent conduct of the defendant and his accomplices in combination with the prior knowledge of the agents quickly established independent probable cause to believe there was ongoing criminal conduct. It was these intervening events, not a trespassory search which led to the discovery of the drug house on Skyline Drive. Officers did not use the GPS to follow the defendant in a

known "load car" to Skyline Drive. Indeed the location of the Jetta was wholly separate from the activity which led to the house. When Figueroa got into the Lexus and drove to Skyline Drive he dissipated any taint arising from the use of the locate GPS the Jetta.[22]

As a final factor courts evaluate "the purpose and flagrancy of the official misconduct," *Hudson,* 547 U.S. at 592, 126 S.Ct. 2159. As observed by the Supreme Court in *Davis, supra*

there was a time when our exclusionary-rule cases were not nearly so discriminating in their approach to the doctrine. "Expansive dicta" in several decisions, see *Hudson, supra,* at 591, 126 S.Ct. 2159, suggested that the rule was a self-executing mandate implicit in the Fourth Amendment itself. See *Olmstead v. United States,* 277 U.S. 438, 462, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (remarking on the "striking outcome of the *Weeks* case" that "the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction"); *Mapp, supra,* at 655, 81 S.Ct. 1684 ("[A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court"). As late as our 1971 decision in *Whiteley v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 568–569, 91 S.Ct. 1031, 28 L.Ed.2d 306 [ (1971) ], the Court "treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule." *Arizona v. Evans,* 514 U.S. 1, 13, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). In time, however, we came to acknowledge the exclusionary rule for what it undoubtedly is—a "judicially created remedy" of this Court's own making. *Calandra, supra,*

---

**22.** It must be repeated that the GPS provided the location of only the Jetta not Figueroa.

at 348, 94 S.Ct. 613. We abandoned the old, "reflexive" application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits. *Evans,* supra, at 13, 115 S.Ct. 1185; see, e.g., *Calandra,* supra; [*U.S. v.*] *Janis,* supra[, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) ]; *Stone* [*v. Powell*], supra[, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) ]; *INS v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). In a line of cases beginning with *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 [ (1984) ], we also recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the "flagrancy of the police misconduct" at issue. *Id.,* at 909, 911, 104 S.Ct. 3405.

The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. *Herring,* 555 U.S. at 143, 129 S.Ct. 695. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Id.,* at 144, 129 S.Ct. 695. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon,* supra, at 909, 104 S.Ct. 3405 (internal quotation marks omitted), or when their conduct involves only simple, "isolated" *2428 negligence, *Herring,* supra, at 137, 129 S.Ct. 695, the " 'deterrence rationale loses much of its force,' " and exclusion cannot "pay its way." See *Leon,* supra, at 919, 908, n. 6, 104 S.Ct. 3405 (quoting *United States v.*

*Peltier,* 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)).

*Davis,* 131 S.Ct. at 2427. For reasons more fully discussed below in the context of "Good Faith" the government conduct at issue, using the GPS to find the Jetta on the morning of October 5th simply was not a flagrant abuse of authority intended to circumvent what the exclusionary rule was designed to accomplish. See *Herring v. United States,* 555 U.S. 135, 143–44, 129 S.Ct. 695, 702, 172 L.Ed.2d 496 (2009) The evidence seized from Skyline Drive house was obtained in such a manner that even if a trespassory warrantless search occurred when agents attached the GPS device and used a signal from the unit to locate the Jetta on October 5th, 2011 the actual discovery of the evidence was more than sufficiently attenuated from that event that suppression is not appropriate.

**Good Faith–Prior Precedent**

On September 20th 2011 when the GPS device was attached to the Jetta there was unanimous support for its validity in the face of Fourth Amendment challenge. For almost the entirety of the time agents were tracking the Jetta with the GPS device, the three Circuit Courts that had expressly addressed the issue had unanimously concluded that police did not implicate the Fourth Amendment warrant requirement by monitoring a GPS tracking device on a car in public. *United States v. Marquez,* 605 F.3d 604, 609–10 (8th Cir. 2010); *United States v. Pineda–Moreno,* 591 F.3d 1212, 1216–17 (9th Cir.2010); *United States v. Garcia,* 474 F.3d 994, 997–98 (7th Cir.2007); see also *United States v. Michael,* 645 F.2d 252 (5th Cir. 1981) (upholding tracking with a beeper attached to a vehicle).[23] In addition, al-

---

**23.** The D.C. Circuit's opinion in *United States v. Maynard,* 615 F.3d 544 (2010), was issued in 2010 creating a minority holding in the

Courts of Appeals that GPS tracking was a search and evidencing a circuit split on the issue.

though distinguished by the Court in *Jones* controlling Supreme Court authority existed which reasonably supported the conclusion that law enforcement could permissibly use tracking devices without a warrant because the use of a data logger was not a "search" within the meaning of the Fourth Amendment. See *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) and *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) *Jones* did not overrule the holding of either case. The distinguishing factor was the ownership or exclusivity of use of the chattel.

In *United States v. Michael,* supra the Fifth Circuit in an *en banc* decision consider the Fourth Amendment implications of the warrantless attachment of a "beeper" or tracking device on a Van owned by a suspected drug manufacturer.[24] The Circuit court reversed an earlier panel and the District Court finding that:

> the DEA agents' reasonable suspicion that Michael was engaged in criminal activity justified the placement and monitoring of the beeper. The actual installation of the beeper was much less intrusive than the typical stop and frisk. Michael was in the pizza restaurant when the installation took place. He was not detained or questioned; he suffered no indignity; nothing from the interior of the van was seized or searched; indeed, nothing even from the van's exterior was removed. See *Cardwell v. Lewis,* 417 U.S. at 591, 94 S.Ct. at 2470. The subsequent monitoring also did not violate Michael's reasonable expectation of privacy. The beeper only aided the agents in the performance of their lawful surveillance. The van traveled public roads and was exposed to public view. Monitoring the beeper

while the agents had reasonable suspicion to believe Michael was conspiring to manufacture MDA did not violate his fourth amendment rights.

\* \* \* \* \* \*

> In balancing the public concerns served by the use of the beeper, to discover Michael's drug manufacturing apparatus against the slight infringement of Michael's expectation of privacy, we find the beeper's use to be eminently reasonable. We hold that the installation and monitoring of the beeper involved no violation of Michael's fourth amendment rights. Accordingly, we reverse the district court's suppression of the evidence seized at the warehouse.

*Michael,* 645 F.2d at 258–59 In July 2010 relying on *Michael,* Eleventh Circuit held in an unpublished opinion that the installation of a GPS device on a defendant's car did not violate the Fourth Amendment "because the [car] was parked in a place easily accessible to the public and was reachable from a public thoroughfare" so that the defendant "had no reasonable expectation of privacy with respect to the exterior of the vehicle." *United States v. Smith,* 387 Fed.Appx. 918, 921 (11th Cir.2010)(unpublished)

As noted above "[S]uppression is not an automatic consequence of a Fourth Amendment violation." *Herring,* 555 U.S. at 137, 129 S.Ct. at 698. Rather, the exclusionary rule applies only where its potential to deter future violations outweighs the substantial social costs of letting guilty defendants go free. *Id.,* at 141, 129 S.Ct. at 701. In light of this limitation, the Supreme Court has repeatedly held that suppression is not appropriate where a Fourth Amendment violation occurs de-

---

**24.** The case was decided only months before the split of the newly created Eleventh Circuit from the old Fifth Circuit. The panel consist- ed of twenty-four appellate judges "sitting *en banc* in mini-convention" *Michael,* 645 F.2d at 259 (Tate, CJ dissenting)

spite the officers' exercise of "good faith." *Id.*, 555 U.S. at 142, 129 S.Ct. at 701. For example, the good-faith exception applies where officers act in reasonable reliance on a subsequently invalidated warrant or a statute later declared unconstitutional. *Id.* (citing cases). In *Davis*, the Supreme Court considered whether the exception applies to searches specifically authorized by the law in existence at the time they occurred. 564 U.S. at ——, 131 S.Ct. at 2428. After balancing the benefits and costs of suppression, the Court held: "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Id.* at ——, 131 S.Ct. at 2427–29, 2434.

Some courts have concluded that unless prior precedent was factually and textually identical to the challenged conduct some impermissible "extension" of the rule of *Davis* takes place for some equally undefined reason said to relate somehow to what is meant by "binding precedent". See e.g. *United States v. Amaya*, 853 F.Supp.2d 818 (N.D.Iowa 2012) (Bennett, J.) Such cases strain at self bred legal gnats to reach a conclusion that neither the Fourth Amendment nor the exclusionary rule require. There is no question that as of September 20th, 2011 binding Eleventh Circuit precedent clearly established that the attachment of a "beeper" tracking device to monitor the movement of a defendant's vehicle violated no constitutional right. Courts quibbling with the

application of the holding of *Davis* to pre-*Jones* governmental conduct do so by finding some distinction in the technological differences in a "beeper" tracking device and a "GPS" tracking device.[25] The actual issue is whether the exclusionary rule is properly applied to the governmental conduct in the absence of any indication in this circuit that something more was required before a tracking device could be attached to a vehicle operated exclusively by a known subject of an investigation.

The judicially created exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, —— U.S. at ——, 131 S.Ct. at 2423. The rule seeks to prevent future Fourth Amendment violations. "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful or when their conduct involves only simple, "isolated" negligence, the 'deterrence rational loses much of its force,' and exclusion cannot "pay its way." " *Id.* at 2427–28. (citations omitted) In *Davis*, which was issued a year prior to the *Jones* decision, the Supreme Court ruled that the exclusionary rule does not apply to "searches conducted in objectively reasonable reliance on binding appellate precedent [that is later overruled] . . . [b]ecause suppression would do nothing to deter police misconduct in [those] circumstances." *Id.* at 2423–24. When properly viewed it is readily apparent that exclusion

---

**25.** Presumably this has something to do with the nature of data to be collected or the proximity of the agent to the vehicle during the collection. First, of course there has been no evidence presented here of any difference. Mr. Figueroa offered no proof and didn't ask the government witness anything about the capabilities of a GPS versus a beeper. More important however is inescapable fact that under the clear rule of *Jones* attachment of **either** would now be unconstitutional because it is the trespass not the characteristics of the electronic "doo dad" that is of constitutional significance. Indeed, that technological driven inquiry is precisely the issue the court did not decide despite the efforts of the concurring Justices to do so. If it is a trespass to put a pink horse into someone else's barn it is a trespass to put in brown one as well. It doesn't matter that we may be more familiar with brown horses than we are with pink ones. Pink horses may behave more rudely than brown horses but it doesn't make it any less a trespass to sneak in a brown one.

of the evidence from the Skyline Drive search will not accomplish the purpose for which the exclusionary rule was created. See e.g. *United States v. Rosas–Illescas,* 872 F.Supp.2d 1320 (N.D.Al.2012) (Proctor, J)

The *Jones* claim fails because (1) Mr. Figueroa has failed to establish the requisite property interest to mount such a challenge. (2) If an unconstitutional trespass is presumed the evidence he seeks to suppress was obtained in a manner which clearly dissipated any taint. (3) The agents acted in good faith when the GPS tracking device was attached to the Jetta and suppression of the evidence seized at the Skyline Drive house would be inappropriate.

### EXIGENT CIRCUMSTANCES–THE WARRANTLESS ENTRY

▪▪▪▪ Mr. Figueroa contended and proved that agents entered the Skyline Drive house approximately thirty minutes before a search warrant was issued. Although the evidence established that the government was actively seeking a search warrant and indeed that the process had been ongoing for several hours the fact remains that the entry into to the house where Mr. Figueroa, the drugs and the money were found was warrantless. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). "A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." *United States v. Tobin,* 923 F.2d 1506, 1510 (11th Cir.1991) *(en banc). United States v. Santa,* 236 F.3d 662, 668 (11th Cir.2000). Under limited circumstances, officers may legally enter a residence without the benefit of a warrant. The law excuses the requirement of a search warrant and allows entry by law enforcement officers when there are exi-

gent circumstances creating a "compelling need for official action and no time to secure a warrant." *Bashir v. Rockdale County,* 445 F.3d 1323, 1328 (11th Cir. 2006) (citations and internal quotation omitted). However, "[t]he exigent circumstances exception only applies if the police reasonably believed that an emergency situation justified warrantless action." *United States v. McCoy,* 259 Fed.Appx. 264, 267 (11th Cir.2007) (citing *United States v. Holloway,* 290 F.3d 1331, 1338 (11th Cir. 2002)). Exigent circumstances may exist when there is "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *Bashir,* 445 F.3d at 1328 (citation and internal quotation omitted).

▪▪▪▪ Once an entry is lawfully made to one portion of a residence a brief entry into other rooms is constitutionally permissible under the "protective sweep" doctrine announced in *Maryland v. Buie,* 494 U.S. 325, 334–35, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). According to *Buie,* law enforcement officials may, "as an incident to the arrest," conduct a "cursory inspection of those spaces where a person may be found" if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* The search may "extend only to a cursory inspection of those spaces where a person may be found," and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. 1093, The Court stressed that "[a] protective sweep is without question a 'search' ... [and] they are permissible on less than probable cause

only because they are limited to that which is necessary to protect the safety of officers and others." *Id.* at 336 n. 3, 110 S.Ct. 1093.

## Exigent Circumstances

In *United States v. Santa,* supra the Eleventh Circuit rejected the Government's contention that exigent circumstance were present when police received a signal from a confidential informant that drugs were in an apartment under surveillance by agents. Officers entered the apartment without a warrant contending later that they had done so the ". . . .prevent the destruction of evidence and [a suspect's] escape." *Santa,* 236 F.3d at 669 Noting that there was no evidence that the occupants of the apartment had any knowledge that they were under police investigation or surveillance the Eleventh Circuit stated that "[t]he urgency arising after the CI emerged from the apartment was entirely foreseeable-the agents themselves had concocted the ruse. [The defendant's] in home arrest may not be justified on the basis of exigent circumstances or created by the Government itself." *Santa,* 236 F.3d. at 676.

██ Mr. Figueroa contends that the Government controlled the release of Artavis McGowan and his passenger from the traffic stop. He argues that if that potential release could have resulted in a warning call to the occupants of the house all that would have been required was for the agent in charge of the investigation to order a further delay of the termination of the traffic stop until a warrant could have been obtained. Certainly the discussion in *Santa* requires consideration of that contention. In *Santa* the Court of Appeals like the District Court recognized that the

government had as much as two days notice that a drug transaction would occur at Santa's Miami apartment.[26] On the day of the arrest further negotiations related to the deal had begun around 2:00 or 3:00 pm at a furniture store between a government CI, the middle man Ramirez with whom Santa shared the apartment and the supplier Gallego for the purchase of heroin. Sometime during the negotiations the CI slipped out and told agents that the deal would take place at the apartment. The DEA had actually established surveillance on the apartment earlier in the day because in previous conversations both Santa and Ramirez indicated to the CI that the deal would take place there. The negotiators left the store and returned around 4:00 pm where it was agreed that the Gallego would leave the store alone and would later bring the drugs to the apartment. The CI, Ramirez and Santa left the furniture store 4:25 pm. Agents at the store notified agents in place at the apartment that the group would complete the transaction at the apartment. Santa, Ramirez and the CI arrived at 4:50 pm. At 6:50 Gallego arrived and made an exchange with Ramirez outside the unit. Ramirez returned to the apartment carrying a white plastic bag. Minutes later the CI emerged from the apartment and gave the concealed agents a prearranged signal that the heroin was in the apartment. Within 30 seconds of receiving the signal agents moved in on the apartment.

At no time did the agents seek to obtain a search warrant. The Circuit Court was unpersuaded by the government's contention that because the CI was supposed to return with money to pay for the drugs Ramirez might have grown suspicious as time went on. The court noted that they

26. In a telephone call two days prior to the transaction Ramirez had told the CI in a call recorded by the DEA that the CI should "come to my house" to obtain drugs. This

information led agents to believe that subsequent transactions would also take place there. *Santa,* 236 F.3d at 665.

entry occurred only seconds after the signal was given and there was no basis for predicting when Ramirez might have grown concerned. The court also stated that because authorities knew that Santa and her children were in the apartment they should have known that the was little chance that she would flee immediately. The *Santa* court emphasized the fact that no effort was made to obtain a warrant at any point during the day even with advance knowledge of the site where the exchange would occur.

In contrast to the behavior of the officers in *Santa* the agents outside the Skyline Drive house had dispatched an agent hours before the 4:18 pm entry to prepare and present to a State Court judge the materials necessary to obtain a search warrant. The process was ongoing with the agent applying for the warrant receiving updates from agents on the scene including information about the stop of the Black Jeep (see Government Ex. # 1, the Affidavit at p. 3) While the situation at the house was fluid at all times Agent Stephens concluded that circumstances had reached critical mass when the warrant had not be secured as the traffic stop was coming to an end. Mr. Figueroa does not appear to dispute that there was a very real possibility that when released the occupants of the Jeep would alert those in the house. Instead he argues that the drug agent could have compelled the deputies to continue the traffic stop beyond the period lawfully permitted.

 First, while the warrant was actually signed only 22 minutes after the agents entered the house Stephens had no way of knowing that before he ordered agents to secure the house. Second, as a matter of law such an order from Stephens would have rendered the traffic stop unlawful and resulted in the suppression of the evidence found in the Jeep. Once an officer has briefly stopped a motor vehicle operator for the purpose of issuing a traffic citation, a continuing detention of the vehicle and its occupants is authorized by the Fourth Amendment only if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonable warrant the intrusion." *United States v. Griffin,* 109 F.3d 706, 708 (11th Cir.1997) (citing *United State v. Tapia,* 912 F.2d 1367, 1370 (11th Cir.1990)). See also, *United States v. Holloman,* 113 F.3d 192, 196 (11th Cir. 1997). The stop "may not last 'any longer than necessary to process the traffic violation' unless there is an articulable suspicion of other illegal activity." *United States v. Purcell,* 236 F.3d 1274, 1277 (11th Cir.2001) The stop had already been extended with the consent to search and no lawful justification for continued detention existed. It was only after the agent entered the house and confirmed that drugs were in fact present that probable existed to arrest the occupants of the Jeep.

 Unlike the officers entry into the apartment of Gloria Santa agents at the Skyline Drive house had every reason to believe that the occupants of the house would soon be alerted to the presence of the agents. Stephens ordered an entry to "secure the scene." That stated purpose alone does not alter the fact that the entry was not authorized by a warrant. "Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency." *Kentucky v. King,* —— U.S. ——, ——, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011) citing *Brigham City v. Stuart,* 547 U.S. 398, 406, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Stephens stated purpose, however is relevant to the inquiry into whether he "created" exigency as they Eleventh Circuit found was the case in *Santa.* "A warrantless search is allowed,[ ], where both probable cause and exigent circumstances exist." *United States v. Tobin,* 923 F.2d at 1510. Exigent circumstances exist "where the

inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Morales,* 868 F.2d 1562, 1575 (11th Cir. 1989). Here there was a warrantless entry and protective sweep of the house. Assuming without deciding that agents seized the drugs and money once they were seen on the counter the Supreme Court has clearly approved the warrantless seizure of property to maintain the status quo while a warrant is obtained where they would or did hold a warrantless search to be invalid. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Van Leeuwen,* 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970). In the present case Stephens did not commence the actual search until warrant had been obtained. (Tr. 7/19/12 p. 39)

The agents watching the Skyline Drive location had reasonable grounds to believe that whoever was in the house would soon be alerted that some form of investigation was on going. With such knowledge the individuals may have been able to flee without detection because agents had only a limited view of the scene.[27] The Eleventh Circuit has long expressed acceptance of the fact that the possibility of destruction of evidence is acute in narcotics cases. *Tobin,* 923 F.2d at 1511 (This Court has held that the need to invoke the exigent circumstances exception to the warrant requirement is "particularly compelling in narcotics cases" because narcotics can be so quickly destroyed. *United States v. Young,* 909 F.2d 442, 446 (11th Cir.1990)). Because both probable cause and exigent circumstances existed at the time of the warrantless seizure of the evidence which was in plain view following that entry was consistent with the requirements of the Fourth Amendment. Suppression is due to be denied.

## CONCLUSION

After consideration of the defendant's motions, the legal position of the parties, the applicable law in light of the evidence adduced at the evidentiary hearings it is recommended that the motions to suppress (Doc. # 28, 30 and 37) be DENIED.

The clerk is DIRECTED to serve a copy of this recommendation on counsel of record for the parties. The parties are DIRECTED to 28 U.S.C. § 636 and the *Federal Rules of Criminal Procedure* with regard to the procedure and requirements to obtain a review of the recommendation by an Article III Judicial Officer.

As to the foregoing it is SO ORDERED this the 2nd day of August, 2012.

---

**27.** In *Santa,* the Eleventh Circuit noted that the fact that agents could not see all of the places from which someone could enter or leave the apartment was not itself an exigent circumstance and it is not suggested to be otherwise here. It is relevant, however that because there was a real possibility that a warning may have been imminent the occupants had a good chance of escaping.