**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JAMES DUFF LYALL, individually and as class representatives; JAVIER CORTEZ, individually and as class representatives; MAGNOLIA BECERRA, individually and as class representatives; SASHA COSTANZA-CHOCK, individually and as class representatives; JOSEPH HOLLIDAY, individually and as class representatives; BENJAMIN WOOD, individually and as class representatives; ELIZABETH LOPEZ, individually and as class representatives; JESSICA RODRIGUEZ, individually and as class representatives,

*Plaintiffs-Appellants*,

v.

CITY OF LOS ANGELES, a public entity; DAVID ROSS, (#33632), individually and in his official capacity; JOHNNY CERVANTES, (#27374), individually and in his official capacity; NICHOLAS CHO, (#39259), individually and in his official capacity,

*Defendants-Appellees*.

No. 13-56122

D.C. No. 2:09-cv-07353-MAN

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret A. Nagle, Magistrate Judge, Presiding

Argued and Submitted
June 5, 2015—Pasadena, California

Filed December 4, 2015

Before:  Jay S. Bybee and Carlos T. Bea, Circuit Judges,
and Elizabeth E. Foote,[*] District Judge.

Opinion by Judge Bybee

## SUMMARY[**]

### Civil Rights

The panel affirmed the district's judgment entered
following a jury verdict, affirmed the district court's
summary judgment in favor of defendants on the basis of
*Heck v. Humphrey*, 512 U.S. 477 (1994), and reversed the
district court's summary judgment in favor of defendants
with respect to a warrantless-entry claim, in an action brought
pursuant to 42 U.S.C. § 1983.

---

[*] The Honorable Elizabeth E. Foote, District Judge for the U.S. District
Court for the Western District of Louisiana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Plaintiffs alleged that police officers violated their First and Fourteenth Amendment rights when they entered, without a warrant, a warehouse where plaintiffs were attending a musical event and subsequently searched and detained them. Affirming the district court, the panel held that the majority of the plaintiffs, who were merely attending the event, lacked standing to challenge the warrantless entry because they had no grounds upon which to claim a reasonable expectation of privacy in the warehouse. The panel further held that event organizer Javiar Cortez was subject to the *Heck* bar regarding his unreasonable seizure claim because he had not challenged the validity of his California Penal Code § 415 disturbing the peace conviction, arising from the encounter with the officers. The panel rejected all of the plaintiffs' claims of error regarding the jury instructions given at trial.

The panel reversed the district court's grant of summary judgment with respect to Cortez's and plaintiff Elizabeth Lopez's warrantless-entry claims. The panel held that Cortez and Lopez, who were organizers of the event and thus were in possession of the warehouse on the night of the event, had standing to challenge the officers' entry into the warehouse. The panel accordingly remanded their warrantless-entry claims for trial.

---

## COUNSEL

Donald W. Cook (argued), Los Angeles, California, for Plaintiffs-Appellants.

Lisa S. Berger (argued), Deputy City Attorney, Michael N. Feuer, City Attorney, Amy Jo Field, Supervising City Attorney, Los Angeles, California, for Defendants-Appellees.

---

## OPINION

BYBEE, Circuit Judge:

The eight plaintiffs in this case were all present at a musical event and fundraiser held in a downtown Los Angeles warehouse on November 16, 2008. During the event, several officers of the Los Angeles Police Department (LAPD), who were looking for suspects who had stolen beer from a nearby convenience store, entered the warehouse without a warrant, rounded up the attendees, searched them for weapons, and required them to participate in a field show-up with a witness to the beer theft. A number of attendees—including two of the plaintiffs here—were arrested for resisting the officers.

The plaintiffs brought suit under 42 U.S.C. § 1983, alleging that the officers' warrantless entry into the warehouse and their subsequent searching and detention of everyone inside violated the attendees' First and Fourth Amendment rights. The district court granted summary judgment to the defendants with respect to the warrantless-entry claims, holding that no plaintiff had standing to challenge the warrantless entry. It also granted summary judgment to the defendants with respect to the unreasonable-seizure claim of plaintiff Javier Cortez, which the district court held was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). The remainder of the claims went to a jury, which found for the defendants on all counts.

We affirm the judgment below in most respects: We agree that the majority of the plaintiffs lack standing to challenge the warrantless entry, we conclude that the district court's holding that Cortez is subject to the *Heck* bar was

correct, and we reject all of the plaintiffs' claims of error regarding the jury instructions given at trial. But we reverse the district court's grant of summary judgment with respect to Cortez's and plaintiff Elizabeth Lopez's warrantless-entry claims. Cortez and Lopez, who were organizers of the event and thus were in possession of the warehouse on the night of November 16, have standing to challenge the officers' entry into the warehouse. We accordingly remand their warrantless-entry claims for trial.

I

A. *The Events of November 16, 2008*

In November 2008, a group of activists, including plaintiffs Javier Cortez and Elizabeth Lopez, organized a "musical and artistic event" designed to raise money for the upcoming Los Angeles Anarchist Book Fair. Ulises Ramirez, another of the organizers, received permission from his friend Josh Haglund to hold the event in a warehouse in downtown Los Angeles that Haglund was subletting and using as an artistic work space.[1] The event was scheduled for the night of November 16 and was to feature several musical performers, along with artists working on screen prints and drawings. The organizers publicized the event broadly through MySpace and various email lists, and approximately 100 people attended.

---

[1] Haglund was the sole sublessee listed on the sublease agreement. He later testified, however, that various friends helped him pay the rent at times. Haglund gave several of these friends keys to the warehouse, including plaintiff Joseph Holliday, who paid Haglund for the right to use the warehouse to construct sets for a student film.

On the night of the event, a group of unknown persons allegedly stole bottles of beer from a convenience store about a mile from the warehouse. Police dispatch put out a call describing the suspects as "six male Hispanic juveniles" wearing "'rocker type' clothing" and giving the license plate number of the pickup truck the suspects were driving. Two LAPD officers, Johnny Cervantes and Nicholas Cho, responded to the dispatch call and, after searching the area, located the suspects' truck parked around the corner from the warehouse. The two officers determined that there appeared to be some kind of party going on at the warehouse, which was unusual given the time of day (Sunday night), and they observed people wearing what they deemed to be "rocker type" clothing going inside. On this basis, Officers Cho and Cervantes decided to investigate the warehouse.

Cortez was standing near the half-open door of the warehouse as the officers approached. The officers told Cortez that they were conducting a theft investigation and needed to speak to whomever was in charge of the event. Cortez told the officers that the event was a "private party" and that they could not come in unless they had a search warrant. He then began backing toward the warehouse.

The officers observed that Cortez—who is Hispanic and who was wearing dark clothing—matched the general description of the theft suspects and ordered him to stop. Cortez did not comply with this order; instead, he turned and ran into the warehouse. He then attempted to close the door, but Officer Cervantes struggled with him and was able to push the door open. The two officers entered the warehouse, seeking to subdue Cortez.

Once inside the warehouse, the officers observed Cortez "walking towards a large group." They ordered Cortez several more times to stop, but he did not do so. The officers then grabbed Cortez and began struggling with him. The crowd around Cortez shouted at the officers to let him go and moved toward the officers in what the officers described as an "aggressive manner." The officers dragged Cortez toward the door, with the crowd continuing to protest. As the officers reached the door, they were struck in the back of the head by a thin, light wooden partition that had been erected near the front door. (It is not known whether someone intentionally pushed over the partition or whether it simply fell by accident.) The impact startled the officers, but they were not injured. The two made it out of the warehouse, at which point Officer Cho handcuffed Cortez and took him into custody while Officer Cervantes called for backup.

Several officers responded to the call for backup, including Sergeant David Ross, who took charge at the scene. When the backup officers arrived, the crowd went back inside the warehouse, and James Lyall, one of the attendees, closed the door with the help of another man. The police began speaking to the attendees through the door, telling them to open it and come out. Lyall, an attorney, responded that the officers needed a warrant to come in. After a few minutes of back-and-forth between Lyall and the officers, Lyall broke off the conversation and moved away from the door. At that point, a group of attendees decided they wanted to obey the officers' orders and come out of the warehouse. After this group went out the door, Sasha Costanza-Chock, another attendee at the event, tried to close the door behind them, but the police pushed it open and ordered everyone out.

As the police began to clear out the warehouse, plaintiff Joseph Holliday, who was not participating in the event but was present at the warehouse that evening to work on sets for a student film, decided to go up on the roof of the warehouse with his assistant "rather than get pulled out the front and get arrested." Once the two reached the roof, they jumped across to the roof of a neighboring warehouse. A police helicopter located Holliday and his companion and ordered them off the roof. Holliday stayed briefly on the roof to place a cell-phone call to his mother but eventually complied with the order and came down. Holliday and his assistant were arrested for resisting a peace officer; they were later released without being formally charged with any offense.

Meanwhile, Sergeant Ross lined the rest of the event attendees against a chain-link fence. The police then conducted pat-down searches of all of the attendees for weapons. They also conducted a "field 'show-up'" with a witness from the convenience store in an attempt to identify suspects in the theft. The witness identified one person in the lineup, Eduardo Ramirez, and the police put Ramirez under arrest. Several other attendees, including Cortez, were arrested for resisting a peace officer in violation of California Penal Code § 148. After about 45 minutes, the police permitted the attendees in the line-up to leave the area. Sergeant Ross then padlocked the warehouse door shut in order to secure the building.

Two days after the event, on November 18, 2008, Cortez pleaded guilty to an infraction[2] violation of California Penal

---

[2] In California, a minor offense can be prosecuted as an "infraction" rather than as a misdemeanor. Cal. Penal Code § 17(d)(1). Infractions are not punishable by imprisonment and are not tried to juries. *Id.* § 19.6.

Code § 415 (disturbing the peace) based on his encounter with the officers. Cortez was entitled to appeal the judgment of conviction under California law, Cal. Penal Code § 1466(b)(1), but did not do so. He later attempted to expunge the conviction but was unable to do so because expungement is not available for infractions. *See id.* § 1203.4(b).

B. *Procedural Background*

Two groups of plaintiffs represented by the same attorney ultimately filed materially identical lawsuits against the City of Los Angeles, the LAPD, Chief of Police William Bratton, and six officers present at the scene, including Officers Ross, Cho, and Cervantes. The plaintiffs in the first lawsuit, which commenced in October 2009, were Lyall, Cortez, Costanza-Chock, Holliday, and three additional attendees at the event: D'Angelo Jones, Magnolia Becerra, and Benjamin Wood. The plaintiffs in the second lawsuit, which commenced in September 2010, were Lopez and Jessica Rodriguez, an attendee.[3] The complaint in each case stated three claims: (1) a § 1983 claim for violation of the plaintiffs' First Amendment rights of free speech and association; (2) a § 1983 claim for violation of the Fourth Amendment, based on the officers' warrantless entry into the warehouse, their arrest of several of the plaintiffs, the pat-down searches of the plaintiffs, and the plaintiffs' detention in the field show-up;

---

[3] The plaintiffs sued as representatives of a class consisting of all of the 100 attendees at the event, but the district court denied their motion for class certification on the grounds that their class definition was inadequate and that the class members' warrantless-entry claims presented individualized questions of law not susceptible to a "blanket determination." Plaintiffs have not appealed that decision.

and (3) a claim under the Bane Act, a California statute that provides a cause of action for persons deprived of federal or state constitutional rights by "threat, intimidation, or coercion." Cal. Civ. Code § 52.1(b).

After discovery, the defendants moved for partial summary judgment in the *Lyall* case, arguing (among other things) that Cortez's unreasonable-seizure claim was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because it challenged the validity of his § 415 conviction, which had not been vacated or overturned, and that the plaintiffs' Fourth Amendment claims relating to the warrantless entry into the warehouse failed as a matter of law because none of the plaintiffs had a reasonable expectation of privacy in the warehouse.[4]   The plaintiffs cross-moved for summary judgment on their Fourth Amendment claims.

The district court granted summary judgment to the defendants on the plaintiffs' warrantless-entry claims, holding that none of the plaintiffs had a reasonable expectation of privacy in the warehouse. The court determined that most of the plaintiffs were simply attendees at an open, widely publicized event and that they had no "possessory interest, or any other connection to the warehouse that might reasonably confer an expectation of privacy." It then rejected Cortez's argument that his status as an organizer of the event entitled him to Fourth Amendment standing, explaining that "mere

---

[4] The defendants also sought summary judgment on all claims against Police Chief Bratton and two of the named officers, on the ground that there was insufficient evidence for the plaintiffs to proceed against those three defendants. The court granted summary judgment with respect to Bratton and the two officers, and the plaintiffs do not appeal that determination.

permission to use a space" for a public event did not create a reasonable expectation of privacy. Finally, the court determined that Holliday, despite his payments to Haglund for access to the warehouse, was not a "co-tenant" there, and it held that even if Holliday were a co-tenant, he could assert, at most, a "limited possessory interest" in the warehouse that "would not have conferred a reasonable expectation of privacy in the space on the night in question."

The court also granted summary judgment to the defendants with respect to Cortez's unreasonable-seizure claim, holding that that claim was barred by *Heck* because it challenged the validity of his § 415 conviction, which had not been vacated, expunged, or otherwise disturbed. The court deemed it irrelevant that Cortez was unable to seek habeas relief due to the brevity of his time in custody, because California law gave Cortez a right of direct appeal from his infraction conviction and he had not pursued such an appeal.

The court denied the plaintiffs' cross-motion for summary judgment, holding that the claims remaining in the case involved genuine issues of material fact that would need to go to the jury.[5]

*Lyall* and *Lopez* were consolidated for trial, which occurred in May 2013. The jury returned a verdict for the defendants on all counts. It found that the plaintiffs had not

---

[5] The district court later considered cross-motions for summary judgment in the *Lopez* case. Applying the reasoning of its *Lyall* summary-judgment order, the district court held that Lopez and Rodriguez did not have standing to challenge the warrantless entry. It accordingly granted summary judgment to the defendants on the warrantless-entry claims while sending the rest of the plaintiffs' claims to trial.

proven by a preponderance of the evidence (1) that any plaintiff had been unreasonably searched or detained, (2) that Holliday had been arrested without probable cause, (3) that any plaintiff's First Amendment rights had been violated, or (4) that any defendant had intentionally interfered with any plaintiff's civil rights by threats, intimidation, or coercion in violation of the Bane Act. The plaintiffs timely appealed the judgment,[6] and we have jurisdiction under 28 U.S.C. § 1291.

## II

The plaintiffs' first claim on appeal is that the district court erred in granting summary judgment to the defendants on the plaintiffs' warrantless-entry claims. We review the district court's grant of summary judgment de novo and "will uphold [the] summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Kohler v. Bed Bath & Beyond of Cal., LLC*, 780 F.3d 1260, 1263 (9th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted).

We note at the outset that the district court analyzed the plaintiffs' challenges to the warrantless entry solely under the reasonable-expectation-of-privacy test derived from the Supreme Court's decision in *Katz v. United States*, 389 U.S. 347 (1967). After the district court ruled on the defendants' summary-judgment motions, however, the Supreme Court decided *United States v. Jones*, in which it considered the question whether the placement of a GPS device on a suspect's car to track the suspect's movements on public

---

[6] One plaintiff, D'Angelo Jones, elected not to appeal and is no longer a party to this case.

streets was a "search" subject to the Fourth Amendment's warrant requirement. 132 S. Ct. 945 (2012).

The government in *Jones* argued that no search had occurred because a person has no reasonable expectation of privacy in the movement of his car over public streets, but the Court declined even to consider that argument. *Id.* at 950. The Court instead cited to the Fourth Amendment's protection of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and held that physically trespassing to place a GPS device on one of the suspect's "effects"—*i.e.*, his car—was a search requiring a warrant. *Id.* at 949. The Supreme Court held that the reasonable-expectation-of-privacy test from *Katz* is not the exclusive metric by which courts should determine whether a Fourth Amendment "search" has occurred. *See id.* at 950 (stating that a person's "Fourth Amendment rights do not rise or fall with the *Katz* formulation"). Rather, "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id.* at 952; *see Soldal v. Cook Cnty.*, 506 U.S. 56, 62–64 (1992) ("[O]ur cases unmistakably hold that the [Fourth] Amendment protects property as well as privacy. . . . [T]he message of . . . cases [like *Katz*] is that property rights are not the sole measure of Fourth Amendment violations.").

*Jones* simply reaffirmed that when the government "physically occupie[s] private property for the purpose of obtaining information," a Fourth Amendment search occurs, regardless whether the intrusion violated any reasonable expectation of privacy. 132 S. Ct. at 949; *see also, e.g.*, *Grady v. North Carolina*, 135 S. Ct. 1368, 1370 (2015) (per curiam) (applying *Jones* and holding that the attachment of a

GPS tracking device to a person's body was a search); *Florida v. Jardines*, 133 S. Ct. 1409, 1417 (2013) (applying *Jones* and holding that the use of police dogs to investigate the curtilage of a home was a search). Only where the search *did not* involve a physical trespass do courts need to consult *Katz*'s reasonable-expectation-of-privacy test. *See Jones*, 132 S. Ct. at 953.

But even if a trespassory search occurred, that does not end our inquiry. *Jones* did not change the fundamental tenet that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." *Id.* at 173 (quoting *Jones v. United States*, 362 U.S. 257, 261 (1960)). In other words, when police trespass on property to carry out a search, a defendant has standing to raise the Fourth Amendment only if it was *his* person, house, paper, or effect searched. The Court in *Jones* did not discuss standing for a simple reason: There, no one disputed that Jones lawfully possessed the car that the officers trespassed on during their search. *Jones*, 132 S. Ct. at 949 n.2. After *Jones*, even when officers carry out a common-law trespassory search, the question remains: Whose Fourth Amendment rights were violated?[7]

---

[7] In addition to challenging the warrantless entry under the Fourth Amendment, the plaintiffs allege that the entry violated their rights under Article I, Section 13 of the California Constitution, which contains

The Fourth Amendment shields not only actual owners, but also anyone with sufficient possessory rights over the property searched. Our own cases have thoroughly discussed what types of possessory rights create standing under the Fourth Amendment. *See, e.g.*, *United States v. Thomas*, 447 F.3d 1191, 1197–99 (9th Cir. 2006); *United States v. Cormier*, 220 F.3d 1103, 1108 (9th Cir. 2000).[8]  To be shielded by the Fourth Amendment, a person needs "some joint control and supervision of the place searched," not merely permission to be there. *See United States v. Lockett*, 919 F.2d 585, 588 (9th Cir. 1990) (citation and internal quotation marks omitted); *see also Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (holding that Fourth Amendment standing cannot be conferred merely because a person is "legitimately on the premises" (brackets omitted)); *United States v. Johns*,

---

language virtually identical to that of the Fourth Amendment. Cal. Const. art. I, § 13.  But the plaintiffs have failed to cite any authority for the proposition that Article I, Section 13 provides greater protection against searches and seizures than the Fourth Amendment.  We have held that it does not. *Sanchez v. Cnty. of San Diego*, 464 F.3d 916, 928–29 (9th Cir. 2006) ("[T]he right to be free from unreasonable searches under [Article I, Section 13] parallels the Fourth Amendment inquiry.").  We will therefore analyze the lawfulness of the warrantless entry solely under the Fourth Amendment.

[8] In these cases, we essentially conflated the trespassory-search and reasonable-expectation-of-privacy tests for Fourth Amendment standing. That is, we required a sufficient possessory interest in property in order for the defendant to have a reasonable expectation of privacy in the property. *See Thomas*, 447 F.3d at 1198–99; *Cormier*, 220 F.3d at 1108.  In light of *Jones*, we recognize that the two tests for Fourth Amendment standing are separate and that a person may have Fourth Amendment standing to challenge a search based on his possessory interest in property independent of any reasonable expectation of privacy in the property. Nevertheless, we believe these cases are useful for determining the types of possessory interests that grant a person standing to challenge a search.

851 F.2d 1131, 1136 (9th Cir. 1988) (person had standing because he had joint "control" over storage unit). For example, where a defendant not only has the right to possess a location, but also the right to exclude others, he likely has Fourth Amendment standing to challenge searches there. *See Rakas*, 439 U.S. at 149 (holding that a defendant with permission to ride in a car did not have standing to challenge a search, and distinguishing a case where a defendant "not only had permission to use the [location searched] . . . but . . . had complete dominion and control over the [location] and could exclude others from it").

For purposes of our analysis, we divide the plaintiffs into three groups: (1) the five plaintiffs who were merely attending the event, (2) Joseph Holliday, who paid Haglund for the right to work on film sets in the warehouse, and (3) Cortez and Lopez, who organized the event and received permission from Haglund to use the warehouse.

A. *Event Attendees (Lyall, Costanza-Chock, Becerra, Wood, and Rodriguez)*

The officers' warrantless entry into the warehouse did not infringe any protected Fourth Amendment interest of the plaintiffs who were merely attending the event, whether considered under either the *Jones* trespass test or *Katz*'s reasonable-expectation-of-privacy test.

These five plaintiffs have not asserted any ownership interests in the places searched, so they must rely on *Katz*'s

reasonable expectation of privacy framework.**[9]**   And they have no grounds on which to claim a reasonable expectation of privacy in the warehouse.  They happened to be inside the warehouse when the police entered, but that fact, without more, is insufficient to confer Fourth Amendment standing. *See Rakas*, 439 U.S. at 135, 141–43 (holding that the mere fact that a person is "legitimately on premises where a search occurs" is not enough to show that the search infringed the person's expectation of privacy); *United States v. Armenta*, 69 F.3d 304, 309 (9th Cir. 1995) (evidence suggesting, at most, that defendant was legitimately on the premises

---

**[9]** Although courts of appeals do not appear to have taken up the ownership question since *Jones*, the Court there instructed that we should apply the common-law trespass theory as it has always existed—which requires a sufficient possessory interest in the property beyond mere permission to remain on the property searched.  The district courts that have addressed this question post-*Jones* take the same view that a sufficient ownership interest is required to confer standing. *See, e.g.*, *United States v. Houseal*, No. 3:11CR-143-H, 2014 WL 626765, at *6 (W.D. Ky. Feb. 18, 2014) ("[A] defendant who does not have either a lawful ownership interest, or a possessory interest in [property] at the time of the search does not possess a legitimate expectation of privacy that the Fourth Amendment will protect."); *United States v. Figueroa-Cruz*, 914 F. Supp. 2d 1250, 1261–62 (N.D. Ala. 2012) ("Under the reasonable expectation of privacy test ownership, and presumably a legal bailment[,] while perhaps factors to be considered, are not dispositive. . . . In *Jones* however, the attachment of the GPS device only becomes a search within the meaning of the Fourth Amendment precisely because of an actual property interest." (brackets omitted)); *United States v. Luna-Santillanes*, No. 11-20492, 2012 WL 1019601, at *7 (E.D. Mich. Mar. 26, 2012) (defendants lacked standing to challenge placement of GPS devices on vehicles because they had not presented any evidence "showing either an ownership or contractual interest in any of these vehicles or exclusivity of use"); *United States v. Hanna*, No. 11-20678-CR, 2012 WL 279435, at *3 (S.D. Fla. Jan. 30, 2012) ("Under . . . *Jones*, an essential component of the Fourth Amendment claim requires that one's own personal 'effects' have been trespassed . . . .").

searched was "insufficient to demonstrate a legitimate expectation of privacy").

B.  *Joseph Holliday*

Joseph Holliday's claim to a protected Fourth Amendment interest in the warehouse is stronger than that of a mere attendee at the November 16 event.  Holliday was making regular payments to Haglund, the subtenant of the warehouse, so Holliday could use the warehouse to construct film sets.  Holliday argues that this arrangement made him a "co-tenant" of the warehouse with a reasonable expectation of privacy and a property interest therein.

We hold that Holliday had neither sufficient possessory rights, nor a reasonable expectation of privacy, in the warehouse.  First, Holliday has insufficient possessory rights to raise Fourth Amendment concerns.  He was not in possession of the warehouse on the night of November 16; he had moved his film sets out of the way to allow the space to be used for the event, and he was there solely as an attendee.  Haglund referred to Holliday as simply one of several "friends of mine who have helped pay the rent" and to whom he had given keys.  He told Holliday at the outset of their relationship that others would be given access to the warehouse and that Holliday would need to "make room" for them as circumstances warranted.  And most importantly, Holliday did not have the right to exclude others from any portion of the warehouse.  Tellingly, Holliday stated in his deposition that he did not feel that his permission was required before the November 16 event could be held.  Nothing about Holliday's arrangement with Haglund "indicates joint control and supervision" of the warehouse.

For the same reasons, we likewise hold that Holliday cannot prevail under a reasonable-expectation-of-privacy theory. Any expectation of privacy Holliday had in the space was inextricably tied to his ownership or possessory rights over the areas searched. *See, e.g.*, *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993). And as explained above, he did not possess such rights when the officers conducted their search.

## C. *Event Organizers (Cortez and Lopez)*

We part ways with the district court with respect to Cortez and Lopez—the two plaintiffs who were present at the November 16 event not as attendees but as organizers. Cortez and Lopez have standing to challenge the officers' warrantless entry under *Jones*, and the district court therefore erred in granting summary judgment to the defendants on their warrantless-entry claims.

Unlike the attendees at the event, Cortez, Lopez, and the other organizers of the event were not "mere visitors," as the defendants claim; they had received permission from Haglund to use the warehouse on November 16 and were in charge of the property that night. The organizers had possession of the warehouse, the right to control it, and the right to bring an action in trespass against intruders.[10] *See Smith v. Cap Concrete Inc.*, 184 Cal. Rptr. 308, 310 (Ct. App. 1982) ("The cause of action for trespass is designed to protect *possessory*—not necessarily ownership—interests in land from unlawful interference. The proper plaintiff in an action

---

[10] Haglund did not charge the organizers money for their use of the space, but that is an irrelevant fortuity. It does not diminish the organizers' right to exclude others from the warehouse.

for trespass to real property is the person in actual possession . . . ." (citations omitted)). After Cortez impeded Officers Cho and Cervantes at the warehouse door and objected to their presence, the officers' entry into the warehouse was trespassory, thereby implicating *Jones*. *See Thomas*, 447 F.3d at 1199 (holding that an unauthorized driver of a rental car may have standing to challenge a search of the vehicle if he has permission to use the car from the authorized driver); *see also Jones*, 362 U.S. at 259, 265–67 (holding Jones had standing to challenge a search of his friend's apartment when the friend gave him use of the apartment and a key).

The defendants argue that, even if Cortez and Lopez (or any other plaintiff) can show that they had a protected Fourth Amendment interest in the warehouse, we can affirm the grant of summary judgment on the ground that the entry was justified by exigent circumstances. We disagree. In a § 1983 case, the question whether exigent circumstances existed is generally one for the jury. *See, e.g.*, *Fisher v. City of San Jose*, 558 F.3d 1069, 1071 (9th Cir. 2009) (en banc); *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992) ("In a civil [§ 1983] action, the determination of whether exigent circumstances exist is properly resolved by the jury."). We can affirm the judgment, therefore, only if "the underlying facts are essentially undisputed, and . . . a finder of fact could reach but one conclusion as to the existence of exigent circumstances." *Hancock*, 958 F.2d at 1375.

In this case, a trier of fact could easily conclude that no exigent circumstances existed to justify the warrantless entry. We have held that "while the commission of a misdemeanor offense," such as the petty theft that Officers Cho and Cervantes were investigating, "is not to be taken lightly, it

militates against a finding of exigent circumstances where the offense . . . is not inherently dangerous." *United States v. Struckman*, 603 F.3d 731, 745 (9th Cir. 2010). A jury could thus decide that the officers' search for the suspects in the beer theft—who police were not even sure were in the warehouse—did not justify a warrantless entry. Similarly, a jury could conclude that Cortez's behavior toward the officers did not justify entering the warehouse without a warrant to apprehend him. Any crime Cortez had committed was minor, and there was little chance that he would flee or destroy evidence.

We therefore cannot hold as a matter of law that exigent circumstances justified the officers' warrantless entry. The question of exigent circumstances should be put to the trier of fact on remand.

\* \* \*

Because Cortez's and Lopez's possessory interest in the warehouse on the night of November 16 gave them standing to challenge the warrantless entry under *Jones*, the district court's grant of summary judgment to the defendants on Cortez's and Lopez's warrantless-entry claims was error, regardless whether they had a reasonable expectation of privacy in the warehouse—a question we do not decide. *See Jardines*, 133 S. Ct. at 1417 ("One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers . . . physically intrud[ed] on [a person's] property to gather evidence is enough to establish that a search occurred."). We accordingly reverse the grant of summary judgment as to Cortez and Lopez and remand their warrantless-entry claims for further proceedings. We

affirm the grant of summary judgment as to the other plaintiffs' warrantless-entry claims.

### III

We next consider Cortez's argument that the district court erred in concluding that *Heck v. Humphrey* bars him from challenging his unreasonable seizure by the police under § 1983. We agree with the district court that the *Heck* bar applies.

In *Heck*, the Supreme Court considered the question whether a state prisoner could challenge his conviction by bringing a § 1983 suit based on allegedly unconstitutional acts committed by state actors during his arrest and prosecution. *Heck*, 512 U.S. at 478–79. The Court concluded that such a claim was not cognizable under § 1983 because tort lawsuits generally "are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id.* at 486. The Court therefore held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–87 (footnote omitted).[11]

---

[11] Whether the *Heck* bar applies may also turn on whether a plaintiff's § 1983 claim undermines the prior conviction in question. Because the parties have not argued this issue on appeal, we do not reach it.

Four years later, in *Spencer v. Kemna*, 523 U.S. 1 (1998), five Justices of the Court suggested that *Heck*'s scope might be narrower than *Heck* itself indicated. In *Spencer*, an inmate was released on parole but then had his parole revoked. When he returned to prison, the inmate first challenged the parole revocation in the state courts and then, when that challenge was unsuccessful, filed a federal habeas petition. Before the federal district court could rule on the petition, the inmate completed his term of imprisonment and was released again. *Id.* at 5–6. The district court thus dismissed the habeas petition as moot.

The Court held that the habeas petition was indeed moot and had to be dismissed. In his opinion for the majority, Justice Scalia rejected the inmate's argument that his habeas petition should not be considered moot because he needed to obtain habeas relief as a prerequisite to pursuing a § 1983 action. The majority described this as "a great non sequitur, unless one believes (as we do not) that a § 1983 action for damages must always and everywhere be available." *Id.* at 17.

Justice Souter, however, wrote a concurrence joined by three other Justices, in which he argued that the petitioner was not, in fact, barred by *Heck* from suing about his parole revocation under § 1983. He explained that *Heck* had not made favorable termination of criminal proceedings "an element of any § 1983 action alleging unconstitutional conviction"; rather, *Heck*'s rule applied only to prisoners "in custody" to whom habeas was available, because the Court had adopted the *Heck* rule in order to prevent a conflict between the habeas statute and § 1983. *Id.* at 19–20 (Souter, J., concurring). Thus, Justice Souter concluded, "a former prisoner, no longer 'in custody,' may bring a § 1983 action

establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy," because after a prisoner is released, "the habeas statute and its exhaustion requirement have nothing to do with his right to any relief." *Id.* at 21.

Justice Stevens dissented in *Spencer*, arguing that the petitioner's habeas petition was not moot. In a footnote, however, he agreed with Justice Souter's view of *Heck*, stating that "it is perfectly clear, as Justice Souter explains, that [the petitioner] may bring an action under 42 U.S.C. § 1983." *Id.* at 25 n.8 (Stevens, J., dissenting). In total, therefore, five Justices on the *Spencer* Court took the position that the *Heck* bar does not necessarily apply to a person who is unable to challenge his conviction by way of federal habeas.

We have looked to the separate *Spencer* opinions for guidance as to whether *Heck*'s favorable-termination requirement applies in all § 1983 cases and have concluded that, at least sometimes, it does not. Two cases, *Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002), and *Guerrero v. Gates*, 442 F.3d 697 (9th Cir. 2006), define the rough boundaries of the *Heck* bar, as we have construed it post-*Spencer*. In *Nonnette*, a state prisoner, after first exhausting his prison administrative remedies, brought a § 1983 suit against prison officials, alleging that they wrongly revoked some of his good-time credits and placed him in administrative segregation without giving him adequate process. The district court held that his § 1983 action was barred by *Heck*. By the time we heard his appeal, however, the inmate had been released. We held that because any habeas corpus

petition filed by the now-former inmate would be dismissed as moot, he was not barred by *Heck* from bringing a § 1983 suit. *Nonnette*, 316 F.3d at 877. We stated that this holding "affects only former prisoners challenging loss of good-time credits, revocation of parole or similar matters; the status of prisoners challenging their underlying convictions or sentences does not change upon release, because they continue to be able to petition for a writ of habeas corpus." *Id.* at 878 n.7.

In *Guerrero*, decided four years later, we distinguished *Nonnette* and concluded that an ex-inmate's § 1983 suit was barred by *Heck*. The plaintiff in *Guerrero* alleged that various LAPD officials had conspired to subject him to excessive force, wrongful arrest, and malicious prosecution. *Guerrero*, 442 F.3d at 702. He did not file suit until approximately a year after his release from prison. *Id.* Examining our previous decisions, we determined that "timely pursuit of available habeas relief" is an important prerequisite for a § 1983 plaintiff seeking to escape the *Heck* bar. *Id.* at 705. Thus, we explained, the plaintiff in *Nonnette* deserved relief from the *Heck* bar because he "immediately pursued relief after the incident giving rise to [his] claims and could not seek habeas relief only because of the shortness of his prison sentence." *Id.* Guerrero, by contrast, never challenged his convictions prior to filing his § 1983 suit, despite having years in custody in which to do so. We held that this "self-imposed" failure to seek habeas relief was not a ground for allowing Guerrero to escape the *Heck* bar.

Cortez's case is more akin to *Guerrero* than to *Nonnette*.[12] Cortez does not come within the narrow exception recognized in *Spencer and Nonnette. Nonnette*'s relief from *Heck* "'affects only former prisoners challenging loss of good-time credits, revocation of parole or similar matters,' not challenges to an underlying conviction." *Id.* (quoting *Nonnette*, 316 F.3d at 878 n.7). We are not an alternative forum for challenging his conviction. We therefore affirm the district court's grant of summary judgment to the defendants with respect to Cortez's unreasonable-seizure claim.

IV

Finally, we turn to the plaintiffs' four claims of error relating to the jury instructions given at trial. None of these claims has merit.

A. *Plaintiffs' Requested Instructions on the Lawfulness of their Search and Seizure and of the Officers' Orders*

After the close of the evidence, the plaintiffs requested that the district court instruct the jury that the officers' search

---

[12] We acknowledge that Cortez's inability to obtain federal habeas relief is no fault of his own: He was in custody for only two days after his arrest and was not sentenced to any prison time as a result of his infraction conviction. The brevity of Cortez's time in custody made federal habeas effectively unavailable to him. But Cortez failed to exercise his right, under California law, to a direct appeal from his conviction. *See* Cal. Penal Code § 1466(b)(1). Cortez's success in his § 1983 suit would imply that his conviction in California was wrongly obtained. Yet his conviction has never been invalidated. Indeed, Cortez has never sought to invalidate it through direct appeal or post-conviction relief. He is thus barred by *Heck.*

of the plaintiffs for weapons and the plaintiffs' detention during the field show-up were unlawful.  In pertinent part, the proposed instruction read:

> I instruct you that each plaintiff was seized and subjected to a search within the meaning of the Fourth Amendment.  I further instruct you that the detention and search of each plaintiff was in violation of the Fourth Amendment.

The plaintiffs' request for this instruction was the equivalent of a motion for judgment as a matter of law, given that the instruction would have compelled the jury to decide for the plaintiffs on the ultimate issue in the case (*i.e.*, whether the officers' conduct was reasonable).  *Cf. Jack Cole Co. v. Hudson*, 409 F.2d 188, 191 (5th Cir. 1969) (defendants' midtrial "request in chambers that the jury be instructed to find for them" was the equivalent of a motion for a directed verdict).  We therefore review the district court's refusal to give the instruction under the standard that applies to the denial of a motion for judgment as a matter of law:  We will not reverse the district court unless "the evidence permit[ted] a reasonable jury to reach only one conclusion." *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 755 (9th Cir. 2006) (quoting *Lawson v. Umatilla Cnty.*, 139 F.3d 690, 692 (9th Cir. 1998)) (internal quotation marks omitted); *see also id.* ("If reasonable minds could differ as to the import of the evidence, . . . judgment as a matter of law should not be granted." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986) (internal quotation marks omitted)).

Based on the evidence presented at trial, a reasonable jury could find that the officers acted permissibly when they

searched the plaintiffs and detained them for the field show-up.  The theft suspects' car had been seen in close proximity to the warehouse, suggesting that the suspects might have taken refuge inside.  Cortez matched the theft suspects' description and behaved suspiciously toward the officers when they questioned him.  The officers testified that the crowd reacted angrily when they attempted to subdue Cortez and that they believed they were in danger—a belief that was exacerbated when the wooden partition, which they thought someone had pushed, fell on top of them.  It was reasonable for the jury to conclude, in light of this testimony, that the officers had sufficient fear for their own safety to justify searching the plaintiffs for weapons, *see Terry v. Ohio*, 392 U.S. 1, 27 (1968), and sufficient reason to believe that suspects in the theft were among the attendees to warrant holding the field show-up.  The district court thus properly refused to instruct the jury to find that the searches and seizures of the plaintiffs were unreasonable as a matter of law.[13]

---

[13] The plaintiffs argue that, even if the evidence supported a finding that the officers had the reasonable suspicion for seizing and frisking the plaintiffs required by *Terry*, the length of the field show-up (30–45 minutes) transformed their detention from a *Terry* stop into an arrest requiring a more demanding showing of probable cause.  We disagree. There is "no bright line rule for determining when an investigatory [*Terry*] stop crosses the line and becomes an arrest"; rather, "whether an arrest has occurred depends on all the surrounding circumstances, and each case must be decided on its own facts."  *Allen v. City of L.A.*, 66 F.3d 1052, 1056 (9th Cir. 1995) (quoting *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988)) (internal quotation marks omitted).  The Supreme Court has indicated, moreover, that "[i]f the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry*," and that one such circumstance is that "'[i]f it is known that an offense has occurred in the

The plaintiffs separately challenge the district court's refusal to give a special instruction stating that "the officers' orders that the officers be allowed to enter and search the premises, and that the plaintiffs had to submit to detentions and searches, were unlawful as a matter of law."  Given that the lawfulness of the searches and seizures themselves was a question for the jury, it follows that the lawfulness of the officers' orders regarding the searches and seizures was also a jury question.  The district court did not err by refusing to give this instruction.

B. *Plaintiffs' Requested Instruction on "Individualized Suspicion"*

At trial, the plaintiffs contended that the searches and seizures that occurred after they were ordered out of the warehouse were unlawful because the police did not have reasonable suspicion that any *particular* member of the crowd was armed or was a suspect in the crime.  The plaintiffs requested that the district court instruct the jury that:

> Defendants were obligated to have individualized suspicion as to each plaintiff whom you find was detained or searched or arrested.  Put differently, for each plaintiff you find was detained and/or searched and/or

---

area, the suspect may be viewed by witnesses to the crime.'"  *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981) (quoting 3 Wayne LaFave, *Search and Seizure* § 9.2 (1978)); *see also United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("[O]ur cases impose no rigid time limitation on *Terry* stops.").  The jury thus was permitted to conclude that the detaining of the plaintiffs for the field show-up was within the permissible scope of the *Terry* encounter and hence lawful on a showing of reasonable suspicion, rather than probable cause.

arrested, defendants must present at least some evidence that that plaintiff was observed or reported to have had involvement in the purported criminal activity at issue.

The district court rejected the plaintiffs' instruction, opting instead to instruct the jury that:

In order to prove the seizure in this case was unreasonable, plaintiffs must prove by a preponderance of the evidence that the officer or officers lacked reasonable suspicion to detain him or her or that the length and scope of the detention was excessive.

. . . .

The touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment imposes no irreducible requirement of individualized suspicion. Such suspicion is not needed, for example, in cases involving an exigency that justifies immediate action on the police's part.

We review de novo whether the district court's instruction misstated the law. *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 988 (9th Cir. 2009).

It did not. The plaintiffs are, of course, correct that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). But although "some quantum of individualized suspicion is

usually a prerequisite to a constitutional search or seizure . . . the Fourth Amendment imposes no irreducible requirement of such suspicion." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–61 (1976). Thus, the fact that the officers' reasonable suspicion of wrongdoing is not particularized to each member of a group of individuals present at the same location does not automatically mean that a search of the people in the group is unlawful. Rather, the trier of fact must decide whether the search was reasonable in light of the circumstances.

Other courts have acknowledged that police officers can have reasonable suspicion to search, or even probable cause to arrest, a group or crowd of people without individualized suspicion as to each person in the group. For example, in *Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009), a group of persons arrested in a protest march sued under § 1983, alleging that they were arrested without probable cause. They argued that the government was required to prove that the police possessed probable cause to believe that each individual person arrested was engaged in the crime of rioting. *Id.* at 406. But the D.C. Circuit rejected that argument, stating that it would impose "an impossible burden" on police and holding that "[p]olice witnesses must only be able to form a reasonable belief that the entire crowd is acting as a unit and therefore all members of the crowd violated the law." *Id.* at 408.

We therefore agree with the district court that the defendants in this case were not required to have individualized suspicion with respect to each plaintiff in order to have reasonable suspicion to search and detain them. To be sure, the fact that the officers did not see specific plaintiffs with weapons or engaging in violent behavior, and that many

of the plaintiffs did not match the police call's description of the suspects as "male Hispanic juveniles," bore on the question whether the searches and seizures were reasonable. Standing alone, however, the officers' lack of individualized suspicion did not make the searches and seizures unlawful.

*Ybarra v. Illinois*, 444 U.S. 85 (1979), is not to the contrary. In *Ybarra*, the police received a tip from an informant that "Greg," a bartender at a certain tavern, possessed heroin and would have some for sale at the tavern on a particular date. On the basis of the tip, the police obtained a warrant to search the tavern and Greg's person for heroin and other contraband. *Id.* at 87–88. When the police arrived at the tavern to execute the warrant, they announced upon entering that they would be conducting a "cursory search for weapons" of each of the nine to thirteen customers in the tavern. One of the officers frisked Ybarra, a patron in the tavern, and felt a cigarette pack in Ybarra's pocket during the frisk; a few minutes later, he frisked Ybarra again, took the pack out of his pocket, and found six packets of heroin inside. Ybarra was subsequently indicted for, and convicted of, possession of heroin. *Id.* at 88–89.

The Supreme Court held that the search violated Ybarra's Fourth Amendment rights. The Court explained the police lacked probable cause to believe that Ybarra was committing any crime: "Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers." *Id.* at 91. Indeed, the *only* thing the police officers knew about Ybarra was that he was "present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." *Id.* The Court deemed this fact

insufficient to give the police probable cause to believe that Ybarra was committing a crime. The Court went on to hold that the initial search could not be upheld as a reasonable *Terry* frisk, because Ybarra had done nothing to indicate to the police that he was armed and dangerous. *Id.* at 93–94.

*Ybarra* stands for the proposition that, if a person is simply present in the vicinity of potential criminal activity, without doing anything else to indicate that he is engaging in criminal activity or that he is armed and dangerous, the police do not have probable cause to search him or reasonable suspicion sufficient to detain him and frisk him for weapons. *Ybarra* does not, however, imply that the police can *never* possess reasonable suspicion or probable cause unless it is individualized. If a group or crowd of people is behaving as a unit and it is not possible (as it was in *Ybarra*) for the police to tell who is armed and dangerous or engaging in criminal acts and who is not, the police can have reasonable suspicion as to the members of the group. Thus, the district court's instruction did not conflict with *Ybarra*.

## C. *The Court's Instruction on the Elements of the Bane Act*

Finally, the plaintiffs contend that the district court's instruction on the elements of their claim under the Bane Act misstated California law in several respects. Specifically, the plaintiffs argue that the district court's Bane Act instruction erroneously required them to prove (1) that the defendants interfered with their rights "by threatening or committing violent acts," (2) that the plaintiffs believed that if they exercised their right to be free from unreasonable detention and search, "then defendants would commit violence against" them; and (3) that "the [police] threats, intimidation, or coercion were independent from the acts inherent in the

detention and search." The plaintiffs claim that the Bane Act does not, in fact, require proof of any of these things.

We can easily dispose of the plaintiffs' arguments about the first two aspects of the district court's Bane Act instruction. The language concerning "violent acts" and the plaintiffs' fear of violence closely tracks that of California's model Bane Act instruction, CACI Instruction No. 3066,**[14]** which at least one California appellate court has approved as a correct statement of law. *See Austin B. v. Escondido Union Sch. Dist.*, 57 Cal. Rptr. 3d 454, 471 (Ct. App. 2007) (quoting an earlier version of the same instruction). The district court did not err by including these elements in its instruction.

The plaintiffs' third objection to the district court's Bane Act instruction—*i.e.*, that it wrongly required them to show threats, intimidation, or coercion independent from the acts inherent in their detention and search—likewise lacks merit. Numerous California decisions make clear that a plaintiff in a search-and-seizure case must allege threats or coercion beyond the coercion inherent in a detention or search in order to recover under the Bane Act. *See, e.g.*, *Allen v. City of Sacramento*, 183 Cal. Rptr. 3d 654, 678 (Ct. App. 2015) ("[A] wrongful arrest or detention, without more, does not satisfy both elements of [the Bane Act]."); *Quezada v. City of L.A.*, 166 Cal. Rptr. 3d 479, 491 (Ct. App. 2014) ("The coercion inherent in detention is insufficient to show a Bane Act violation."); *Shoyoye v. Cnty. of L.A.*, 137 Cal. Rptr. 3d 839, 849 (Ct. App. 2012) ("The [Bane Act] requires a showing of coercion independent from the coercion inherent in the wrongful detention itself.").

---

**[14]** *See* Judicial Council of Cal., 2 Civil Jury Instructions 240 (2011).

The plaintiffs cite two search-and-seizure cases in which, they argue, California courts held that a plaintiff can state a Bane Act claim without a showing of independent threats, coercion, or intimidation, but neither citation supports their position. In *Venegas v. County of Los Angeles*, 87 P.3d 1, 13–14 (Cal. 2004), the California Supreme Court decided only that a plaintiff need not allege that a defendant acted with "discriminatory animus" in order to state a Bane Act claim; the court did not otherwise address what elements the Bane Act requires a plaintiff to prove. *See Allen*, 183 Cal. Rptr. 3d at 676 ("[T]he only issue the Supreme Court considered [in *Venegas*] was whether [the Bane Act] required a showing that the defendants acted with discriminatory animus."). And in *Bender v. County of Los Angeles*, 159 Cal. Rptr. 3d 204 (Ct. App. 2013), an unlawful-arrest and excessive-force case, the Court of Appeal expressly declined to rule on whether the Bane Act required coercion beyond the coercion inherent in any arrest; it held only that "[w]here, as here, an arrest is unlawful *and* excessive force is applied in making the arrest, there has been coercion 'independent from the coercion inherent in the wrongful detention itself'—a violation of the Bane Act." *Id.* at 213 (quoting *Shoyoye*, 137 Cal. Rptr. 3d at 839). In short, *Venegas* and *Bender* do not speak to the issue the plaintiffs raise, and they cast no doubt on the correctness of the district court's instruction.

V

For the foregoing reasons, we reverse the district court's grant of summary judgment with respect to Javier Cortez's and Elizabeth Lopez's warrantless-entry claims, and we

remand those claims for trial.  We otherwise affirm.  The parties shall bear their own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**